UNITED STATES of America,
Appellant,

v.

Albert H. ROTHROCK and Vivian S.
Rothrock, Defendants, Appellees.

No. 86–1016.

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1986.

Decided Dec. 4, 1986.

Donald W. Searles, Tax Div., Dept. of Justice, with whom Michael L. Paup and Robert E. Lindsay, Tax Div., Dept. of Justice, Roger M. Olsen, Acting Asst. Atty. Gen., Washington, D.C., and Richard S. Cohen, U.S. Atty., Augusta, Me., were on brief, for appellant.

Peter J. Detroy, III with whom Norman & Hanson, Portland, Me., and Robert J. Foley, Sanford, Me., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and COFFIN, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal by the United States from the district court's granting of a judgment of acquittal (and, alternatively, a new trial) after appellees were convicted by a jury on four counts of tax evasion under 26 U.S.C. § 7201 (1982). The district court stated its reasons for overturning the verdict in a comprehensive opinion.

Albert and Vivian Rothrock were indicted for willfully attempting to evade their joint income tax for the tax years 1979–1982. At a jury trial, the government showed that during the four years in question the Rothrocks did not report over $180,000 of taxable income [1] and underpaid their federal tax obligation by nearly $90,000.[2]

The Rothrocks did not challenge the government's figures but defended on the ground the underreporting of income had been unintentional. They introduced evidence tending to show that Albert Rothrock, a physician specializing in proctology, was disorganized, had little talent for or interest in business-related matters, and had a reputation for honesty.

This evidence framed the primary issue at trial, whether the reporting errors resulted from a willful scheme or from the Rothrocks' misplaced reliance on an incompetent tax preparer. The Rothrocks contend that the doctor's dislike of finances caused them historically to delegate the preparation of taxes to another person. According to the Rothrocks, this delegation of responsibility was complete; they would simply sign the forms as presented by the tax preparer without even a cursory review of their accuracy. The Rothrocks thus insist that their underpayment of income tax was unintentional and not actionable under the criminal tax laws, which require a showing that the Rothrocks signed the returns knowing them to be false. *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976).

Warren Arthur, who prepared the Rothrocks' returns for the years in question, was the government's primary witness. An insurance salesman, Arthur originally met Dr. Rothrock in 1971 or 1972 when he convinced the doctor to purchase disability insurance. The business and social rela-

---

\* Of the Fifth Circuit, sitting by designation.

1. The government's calculations were as follows:

| Tax Year | Gross Income | | Net Taxable Income | |
|---|---|---|---|---|
| | Actual | Reported | Actual | Reported |
| 1979 | $106,007.59 | $72,587.00 | $59,303.25 | $28,762.00 |
| 1980 | $144,520.10 | $93,972.00 | $81,359.41 | $34,972.00 |
| 1981 | $151,056.15 | $94,973.00 | $94,724.54 | $37,445.00 |
| 1982 | $142,172.09 | $106,620.00 | $84,164.14 | $34,896.00 |

2. The government's evidence established that defendants owed additional taxes totalling $13,495.59 in 1979, $22,617.34 in 1980, $28,576.52 in 1981, and $21,560.61 in 1982.

tionship between the two men blossomed over time. Ultimately, for either the tax year 1976 or 1977, Dr. Rothrock requested Arthur's assistance in preparing his tax forms. The doctor, according to Arthur, seemed unconcerned that he had no training or particular competence in accounting or tax skills.[3]

In computing the Rothrocks' income, Arthur testified to having relied primarily on the doctor's receipts from medical insurance companies, as reported on Forms 1099. When asked why he did not search for direct patient payments or interest and investment income, which combined accounted for the bulk of the Rothrocks' unreported income, Arthur responded that he felt such a search was unnecessary. He testified that the doctor asserted that his and his wife's only source of income was from insurance companies; in those years where other income was reported, the doctor or his wife had specifically mentioned the existence of that income. Indeed, Arthur claimed that he would not make a "single entry without Dr. Rothrock telling ... me what that entry should be." Arthur also stated that when he completed the Rothrocks' taxes, he and the doctor would review the form line by line.

On cross-examination, defendants brought out significant inconsistencies in Arthur's testimony.[4] Nevertheless, the jury returned verdicts of guilty against defendants on all four counts of the indictment. Shortly thereafter, the Rothrocks moved for a judgment of acquittal notwithstanding the verdict and, in the alternative, a new trial. On December 13, 1985, the district court granted both motions. The government filed a timely notice of appeal

and now challenges the court's decision to upset the jury's verdict.

## I. JUDGMENT OF ACQUITTAL

■ In giving its reasons for allowing a judgment of acquittal, the district court recognized that its power to set aside a jury verdict was very circumscribed. It acknowledged that it was duty-bound to construe the evidence, together with all legitimate inferences to be drawn therefrom, in the light most favorable to the government. *United States v. Lamare,* 711 F.2d 3, 5 (1st Cir.1985); *United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). The court also properly acknowledged that it may not assess the credibility of a witness in determining the sufficiency of the government's evidence. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978). So long as the evidence was such that a rational mind might fairly find guilt beyond a reasonable doubt, the court could not disturb the jury's verdict. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

Nonetheless, the court here directed a verdict, resting its analysis in no small part on its low assessment of Arthur's credibility, concluding that his testimony was so "internally inconsistent and contrary to his testimony before the Grand Jury that we think he is thoroughly discredited." The court thought no "rational trier of fact could conclude beyond a reasonable doubt that Rothrock told Arthur not to report as income such things as fees received from patients, proceeds from the sale of real

---

**3.** Arthur testified that he repeatedly urged the Rothrocks to employ a qualified certified public accountant. He claims that the Rothrocks rejected this advice, allegedly telling him "frankly that they didn't want to have people in the area to know their business."

**4.** On cross-examination, Arthur acknowledged that defendants often provided him with a grocery bag full of receipts, cancelled checks, and bank statements. As later events demonstrated, the records in the bag pointed to income beyond that reported on the Forms 1099. Arthur claimed never to have examined these doc-

uments, believing that such an effort would be duplicative and wasteful. He felt that the receipts could offer no new information about the Rothrocks' income, given the doctor's statement that the family's income derived exclusively from insurance payments. It was brought out also that Arthur had made earlier statements indicating he had known Dr. Rothrock was receiving some patient income. Arthur conceded knowing that Rothrock had engaged in mortgage and real estate transactions, which could have given rise to reportable income.

estate, or interest income." The court went on to weigh the government's remaining evidence of willfulness[5] against the defense's evidence of Dr. Rothrock's aversion to paperwork and his reputation for honesty. It concluded that the state of the record did not allow a rational finding of guilt beyond a reasonable doubt.

 We think the district court underestimated the extent to which Arthur's testimony, together with the government's other evidence, was sufficient to support a rational finding of guilt beyond a reasonable doubt. Arthur's inconsistencies, brought out in cross-examination, could have been thought by the jury to reflect Arthur's desire to shield himself from criticism (and possibly prosecution) for not having prepared an honest and competent return. The same jury might still have believed, however, that the Rothrocks told Arthur, as he testified, what income to report, and that Arthur went over the returns with the Rothrocks after making them out. A jury is entitled to believe some part of a witness's testimony and not another. *See, e.g., United States v. Cueto,* 628 F.2d 1273, 1275 (10th Cir.1980). The government's other evidence could be thought by the jury to support Arthur's testimony that, with a few exceptions, the only reportable income mentioned to him as such by the Rothrocks was the medical insurance income. There was evidence that in conversations with an IRS agent, Dr. Rothrock denied having any direct patient income, and that both Rothrocks, in other conversations with an agent, denied having income from non-medical sources. As in fact Dr. Rothrock had significant direct patient income, and as there was evidence that he was personally involved in mortgage transactions that had resulted in interest income, a rational jury could have concluded that the Rothrocks were consciously untruthful in denying the exist-

ence of these other types of income, and that in failing to report them they had not relied entirely on the tax preparer. Dr. Rothrock was a law school graduate, had engaged in numerous real estate transactions, had mentioned his interest income in loan applications, and could be viewed as a sophisticated businessman. The district court erroneously seems to have believed that the government's case had to stand or fall on whether there was direct proof that the Rothrocks had specifically ordered the preparer to prepare fraudulent returns. In fact, the question was not whether the preparer was ordered to falsify but whether the Rothrocks knew, when they signed the returns, that the returns understated their income. We think there was evidence here from which a rational jury could infer beyond a reasonable doubt that the Rothrocks were aware that the returns were false when they signed them. Accordingly, we reverse the district court's decision to grant the judgment of acquittal.

## II. NEW TRIAL ORDER

 It is a harder question whether to sustain the district court's ordering of a new trial, based on its conclusions that the verdict was against the weight of the evidence and would result in "a miscarriage of justice." A district court has greater power to order a new trial than to overturn a jury's verdict through a judgment of acquittal. As stated in *United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980), "[m]otions for a new trial are directed to the discretion of the trial court. In considering such a motion, the court has broad power to weigh the evidence and assess the credibility of . . . the witnesses who testified at trial. . . ." *See also United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir. 1979) (district judge may weigh the evidence and evaluate the credibility of witnesses). We will not disturb the disposi-

---

5. Beyond Arthur's testimony, the government's evidence included statements by several IRS agents that during his audit Dr. Rothrock repeatedly claimed that all of his income was from insurance company reimbursements and that he had no interest or investment income.

The government also brought out that the doctor had graduated from law school and had engaged in a number of successful business ventures, evidence designed to call into question the doctor's assertion of financial naivete.

tion of a new trial motion unless the court abused its discretion or misapplied the law. *United States v. Rodriguez*, 738 F.2d 13, 17 (1st Cir.1984); *United States v. Thornley*, 707 F.2d 622, 626 (1st Cir.1983).

Despite our deference to district courts, this circuit, like most of today's courts of appeals, puts definite limits upon a district court's right to upset a jury verdict. To protect the fragile power given to the jury, we must ensure that the "remedy of a new trial is sparingly used, and then only where there would be a 'miscarriage of justice.' " *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir.1979), *quoting United States v. Leach*, 427 F.2d 1107, 1111 (1st Cir.), *cert. denied*, 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970). This court has emphatically stated that a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result. *See, e.g., Payton v. Abbott Labs*, 780 F.2d 147, 152–53 (1st Cir. 1985); *Borras v. Sea–Land Service, Inc.*, 586 F.2d 881, 887 (1st Cir.1978). Where an order for a new trial is predicated on the district court's evaluation of the weight of the evidence rather than its concern about the effect of prejudicial acts that may have resulted in an unfair trial, we will exercise a more stringent standard of review, *Payton*, 780 F.2d at 152, requiring the court to refrain from interfering " 'unless it is quite clear that the jury has reached a seriously erroneous result.' " *Borras*, 586 F.2d at 887, *quoting* 6A J. Moore, Moore's Federal Practice ¶ 59.–08[5], at 59–160 to 161.

■ In ordering a new trial here, the court articulated the correct standard, namely, that conviction would result in a miscarriage of justice. The question is whether that finding is warranted. As earlier noted, there was sufficient evidence to convict. On the other hand, the court, having heard and seen the Rothrocks and Arthur, was persuaded that the Rothrocks had given the necessary information to the preparer, and had innocently overlooked the errors in the returns. That Arthur made significant misstatements on the stand is clear on the record, whatever weight one may attach to this fact. We must bear in mind also that this is a criminal, not a civil case. The government must prove guilt beyond a reasonable doubt, reflecting the structuring of our criminal jurisprudence to avoid stigmatizing and taking away the liberty of an innocent person. *See In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *id.* at 372, 90 S.Ct. at 1076–77 (Harlan, J., concurring) ("it is far worse to convict an innocent man than to let a guilty man go free"). In a criminal case we are slightly more reluctant than in a civil case to reject a trial judge's strongly voiced assessment that a jury's verdict was unjust as being contrary to the weight of the evidence. Given the serious extent to which Arthur was impeached, and the district judge's considered belief that an injustice had occurred, we hold that the district court did not abuse its discretion in ordering a new trial.

### III.

■ The parties raise two additional issues that may recur during the new trial and thus merit discussion. First, the Rothrocks contend that the district court erred by instructing the jury on willful blindness. The court agreed, but because the Rothrocks had not objected to the instruction during the trial, concluded that the error did not constitute grounds for reversal. We believe the instructions were properly given.

In *United States v. Picciandra*, 788 F.2d 39 (1st Cir.1986), we held that a willful blindness instruction is appropriate if a defendant claims a lack of knowledge, the facts suggest a conscious course of deliberate ignorance, and the instructions, taken as a whole, cannot be understood as mandating an inference of knowledge. *Id.* at 46. The primary issue in this case is whether the record contains enough evidence that defendants engaged in a conscious course of deliberate ignorance. We think it does. For example, the government could reasonably argue that the Rothrocks intentionally hired an inexperienced

tax preparer hoping that he would lack the knowledge to anticipate sources of income not readily apparent. Moreover, defendants emphasized at trial that Arthur had a sizable financial interest in the Rothrocks' continued investment in various insurance programs. The Rothrocks could have expected that Arthur's dependent position would cause him neither to question their financial assertions nor to search vigorously for income not reported in the Forms 1099.

■ The foregoing examples, by no means exhaustive, show how the Rothrocks may have deliberately established a tax reporting system by which advantageous errors would inevitably occur. If the jury were to believe this theory of the case, the Rothrocks could not defend by claiming never to have examined in any depth the completed tax forms. The purpose of the willful blindness theory is to impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps.

■ The second issue warranting discussion is the Rothrocks' assertion that the government made improper comments on the evidence during its closing argument, where it described Dr. Rothrock as "a man that is enjoying the best of America's life, the best. A lifestyle that most people in America can only dream about." The government repeated this theme in its rebuttal: "part of the reason, unfortunately, life was so great is part of the income that has to be paid, as we all have to pay part of our income to the United States, wasn't being paid.... It was being spent on living great." The Rothrocks contend that the government was using this line of argument to appeal to class prejudice, a tactic long considered impermissible. *See, e.g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 851–52, 84 L.Ed. 1129 (1940).

We cannot say that, where a taxpayer is living at a level that could appear too high for one receiving income in the amount reported, the government may not point to

this in arguing that the taxpayer must have realized that his reported income was too low. *See, e.g., United States v. Hughes*, 766 F.2d 875, 878 (5th Cir.1985); *United States v. Daniels*, 617 F.2d 146, 150 (5th Cir.1980). Flaws in such an argument can be pointed out to the jury by opposing counsel. Still, we do not like the tone of some of the government's argument here ("a man that is enjoying the best of America's life, the best"). Argument, especially the government's, should not degenerate into an appeal to prejudice, and we encourage the district court to intervene whenever this happens and also to refuse to permit argument of this type to stray beyond its evidentiary basis in the record.

*The judgment of acquittal is reversed; the verdict is set aside and the case is remanded to the district court for a new trial or other proceedings not inconsistent with this opinion.*