USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-1286 UNITED STATES, Appellee, v. SANTO RUIZ, Defendant - Appellant. No. 95-1287 UNITED STATES, Appellee, v. VIRGILIO RUIZ, Defendant - Appellant. ____________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ___________________ ____________________ Before Stahl and Lynch, Circuit Judges, ______________ and Woodlock,* U.S. District Judge. ___________________ _____________ John C. Doherty , by appointment of the Court, for appellant ________________ Santo Ruiz. Virgilio Ruiz on brief pro se. _____________ Kevin J. Cloherty, Assistant United States Attorney, with whom __________________ John M. Griffin, Assistant United States Attorney, and Donald K. ________________ __________ Stern, United States Attorney, were on brief for appellee. _____ ____________________ February 12, 1997 ____________________ _____________________ *Of the District of Massachusetts, sitting by designation. STAHL, Circuit Judge. In July 1993, a grand jury STAHL, Circuit Judge. _____________ indicted defendants-appellants Santo Ruiz and Virgilio Ruiz, two brothers, for various crimes arising out of a December 1990 fire that destroyed their variety store in Roxbury, Massachusetts. After a ten day trial, a jury convicted the defendants of maliciously destroying by fire a building used in interstate commerce (18 U.S.C. 844(i)), mail fraud (18 U.S.C. 1341), conspiracy to commit the foregoing offenses (18 U.S.C. 371), and use of fire to commit a federal felony (18 U.S.C. 844(h)(1)). On appeal, the defendants challenge the district court's denial of their motions to acquit and for new trial. They also appeal their sentences. We affirm their convictions but vacate their sentences and remand for resentencing. I. I. __ Sufficiency of the Evidence Sufficiency of the Evidence ___________________________ We review de novo the defendants' challenge to the __ ____ evidentiary sufficiency of their convictions, construing the evidence in the light most favorable to the government. See ___ United States v. Olbres, 61 F.3d 967, 970 (1st Cir.), cert. _____________ ______ _____ denied, 116 S. Ct. 522 (1995). Like the district court, we ______ "must resolve all evidentiary conflicts and credibility questions in the prosecution's favor," and, among competing plausible inferences, we "must choose the inference that best fits the prosecution's theory of guilt." Id. With this ___ -3- 3 standard of review in mind, we turn to the facts of the case.1 A. Facts _________ 1. Pre-Fire Events ___________________ In February 1990, defendant Santo Ruiz opened a retail business named Brothers Fashions and Multiple Services ("Brothers Fashions"), in the basement area of a three-story residential duplex. Three of Santo's brothers, Pablo, Frederico, and co-defendant Virgilio Ruiz, shared an apartment directly above the store. The duplex comprised six residential apartments occupied by a total of sixteen residents, including the building's owner.  ____________________ 1. At the end of the government's case, Santo and Virgilio Ruiz moved for judgment of acquittal, pursuant to Fed. R. Crim. P. 29. Because the defendants presented evidence in their defense after the denial of the initial motion, they are deemed to have waived review of the earlier motion. See ___ United States v. de la Cruz-Paulino, 61 F.3d 986, 997-98 (1st _____________ __________________ Cir. 1995); United States v. Amparo, 961 F.2d 288, 291 (1st _____________ ______ Cir. 1992). Thus, in reviewing the defendants' sufficiency of the evidence challenge, we consider, in the light most favorable to the verdict, the evidence presented in the defense case. See 2 Charles A. Wright, Federal Practice and ___ ____________________ Procedure 463, at 643-45 (1982). _________ We note also that although defendants' motions for acquittal and new trial were filed more than seven days after the verdicts were rendered and the jury discharged, the motions were timely because, within that seven-day period, the district court extended the time allowable for making the motions. See Fed. R. Evid. 29(c) & 33; see also Carlisle v. ___ ___ ____ ________ United States, 116 S. Ct. 1460, 1463-64 (1996) (holding that, _____________ absent proper time extension, a district court may not entertain an untimely Rule 29 motion). Thus, we consider the motions timely and properly preserved for our full review. See id. at 1471 (explaining that a sufficiency challenge ___ ___ untimely brought in the trial court is subject to "plain error" review) (Ginsburg, J., concurring). -4- 4 Santo borrowed $10,000 from another brother, William Ruiz, as the start-up capital for the store; additionally, Santo incurred a debt of $4000 to William for the store's fixtures.2 The $14,000 debt remained unpaid in its entirety through the time of the fire. The store sold sundry items, including clothing, shoes, blankets, cosmetics, household products, music albums and cassettes, beverages and candy. Santo obtained the store's merchandise for cash from a variety of sources located in Massachusetts, New Hampshire, New York, Florida, and California. Virgilio Ruiz spent much time at the store and frequently assisted Santo, who did not speak English, with needed language interpretation. Although Santo was the putative owner of Brothers Fashions, the evidence suggests that Santo and Virgilio represented to others a joint ownership and responsibility for the store. For example, both Santo and Virgilio signed the lease for the space as well as the business certificate filed with the City of Boston. In early September 1990, Santo and Virgilio negotiated for the installation of a store security alarm and jointly signed the agreement with the alarm monitoring  ____________________ 2. William had operated a convenience market in the basement space before the opening of Brothers Fashions.  -5- 5 service. The alarm, which could detect heat and motion, was designed primarily to trigger when a burglar entered the premises after hours; a sufficient amount of smoke from fire could also trigger a response. The alarm, however, would not operate unless the subscriber activated the system by entering the proper pass code. About two weeks before the fire, Santo ceased activating the alarm system. In early November 1990, approximately nine months after Brothers Fashions opened and about six weeks before the fire, Santo and Virgilio obtained $40,000's worth of insurance coverage for the store's contents. During discussions with the insurance agent, the defendants specifically asked about the processing and payment of loss claims. Although such information was not a usual part of the agent's initial discussions about insurance coverage, in response to this inquiry, he explained that receipts and cancelled checks would be required to prove a loss. Virgilio, representing Brothers Fashions, signed an insurance finance agreement. Coverage began shortly thereafter when the brothers tendered a down payment of approximately $750. The payment schedule provided that a first installment of approximately $250 would fall due on December 20, 1990. Santo kept in his possession most of the time the only set of keys to Brothers Fashions. Before closing the business each day, Santo would secure the store-front with -6- 6 three heavy metal security shutters, each fastened with two padlocks. The store's back door, which was rarely opened, measured three-feet wide by four-feet tall and could be opened only from the inside of the store. It was secured on the inside with a sliding lock and at least one wooden cross- bar laid across the door. An outer iron grate, locked from the inside with a padlock, further secured the back door. Less than two days before the fire, Brothers Fashions was fully stocked with merchandise displayed on clothing racks, shelves, and in display cases. 2. The Fire ____________ Around 2:00 a.m. on Sunday, December 16, 1990, a fire raged through Brothers Fashions. The close proximity of the store to a fire station resulted in near immediate response. Nonetheless, the blaze was serious enough to warrant the services of some seventy fire department personnel and over one dozen fire vehicles. Arriving at the scene, fire-fighters encountered the metal security shutters lying in the street in front of the store; the shutters apparently had been blown off the store-front by a powerful explosion. A fire-fighter in the first group to reach the back of the building noticed the store's back door standing open with flames shooting out from the basement. The fire-fighters extinguished the fire without forcible entry of the property. -7- 7 Normally, when a store stocked with clothing burns, piles of clothing in various stages of ruin remain. After the fire at Brothers Fashions was suppressed, however, a casual inspection of the damaged store revealed very little burned or charred merchandise; rather, all that was visible were a few beverage bottles, some canned goods and minimal charred foodstuffs. The dearth of charred merchandise and the complete absence of clothing remnants in the store evince that it was nearly empty when it burned. All of the apartment tenants, except Virgilio, escaped unharmed from the burning building. None of the tenants, including Virgilio, required fire-fighter assistance to evacuate. Virgilio suffered second and third degree burns on his ankles, a severe cut above his left eye, and large bruises below his left eye and across his chest. An ambulance carried him from the scene to the hospital, where he remained for eighteen days. 3. Post-Fire Events ____________________ Subsequent investigation revealed that the fire originated in two distinct locations within the store and burned in an unusual manner. Specifically, the burn pattern indicated that an accelerant, such as gasoline, had been poured over a counter and other areas. The building's electrical and natural gas distribution systems showed no sign of having caused or contributed to the fire. Following -8- 8 the fire, Boston Gas Company, the natural gas provider for the building, conducted a search of its records for the period from 1984 through the time of the fire for any reports of gas leak repairs at the building. The search revealed nothing. Sometime within the first two weeks after the fire, John Greenaway, who had been hired for carpentry work on the premises, opened up the boarded-up store so that Santo could retrieve an empty clothes rack. In January 1991, Santo and Virgilio prepared, jointly signed and submitted a claim to their insurer -- via certified mail -- asserting a contents loss of some $48,000. The claim detailed various items of store merchandise and fixtures, including thousands of dollars' worth of men's and women's clothing, curtains, shoes, blankets, music albums and cassettes, videos, watches, candy, household items and toys. Contrary to the insurance agent's earlier advice and the insurance company's request, the defendants did not submit any receipts, invoices, or other records to support their claim of loss. Instead, the defendants claimed that the fire destroyed all such records and submitted a couple of photographs purporting to represent the store merchandise at the time of the fire and a cancelled check from Virgilio's bank account for approximately $15 in cigarette tax. When -9- 9 asked by the insurance company, Santo could not recall the names of any of his retail merchandise suppliers. At various times before trial, Virgilio related his version of the fire events to his attending physician, a Boston Fire Department investigator, and, in a sworn deposition, representatives of the insurance company. He professed a general inability to recall clearly and gave somewhat inconsistent accounts of the fire events. To the extent Virgilio's various stories overlap, they indicate that: he awoke in the first floor apartment to the smell of smoke, went to the living room to check the gas heater and saw smoke coming through the floor; he then heard an explosion and ran to awaken his sleeping brothers (Pablo and Frederico) to warn them of the fire; he picked up the telephone to call the fire department, but the line was dead; he proceeded to run out the front hallway of the duplex and down the stairs toward the building's front exit; on his way out to the sidewalk in front of the duplex, another explosion occurred and his "fuzzy" socks caught on fire, causing the injuries to his ankles; at some point, he ran into a door -- perhaps the front door of the apartment unit -- causing his bruises and the severe cut above his eye. 4. The Defendants' Case ________________________ The defendants presented a joint defense, calling to the stand members of the Ruiz family: Pablo, Frederico, -10- 10 Santo, and Rosa (Santo's wife). Pablo and Frederico testified that, on the night of the fire, Virgilio went to bed around midnight, and they retired soon thereafter. They stated that Virgilio later woke them up because of the fire. Frederico testified that he then dressed quickly and proceeded out the front door. As he descended the front stairs, he met Virgilio, who was bleeding from his forehead and down his face. Frederico and Virgilio ran out the front of the building together. Frederico was not injured -- by flame or otherwise -- as he exited. Upon reaching the sidewalk in front of the building, he noticed fire coming out of the basement store. Frederico said that he then told the fire-fighters that Pablo was still inside the building. Pablo testified that his only avenue of escape from the burning building was the apartment's back door. He stated that when he exited the building, he observed two fire-fighters, who, he says, had been attempting to pry open the apartment's back door to let him out. Both Pablo and Frederico testified that they saw fire-fighters force open the store's back door, which, they claimed, had been closed. They further claimed that, upon the opening of the back door -- which measured four-feet by three-feet -- fire-fighters emerged from within the store wearing full fire-fighting regalia, including oxygen tanks and masks. -11- 11 Santo testified in his defense. He explained that he initially did not insure the contents of the Brothers Fashions because he wanted first to see how the business fared. He testified that only he knew the alarm pass code, and that he failed to activate the alarm for several weeks before the fire because of the recurrence of false alarms. He had deduced that rats entering the store after hours (to eat candy) triggered the alarm, and he wanted to "kill" the rodents before further engaging the alarm. He testified that he complained about the rats to both the owner and to Greenaway, who, in turn, testified that Santo had never complained to him about a rat problem. Santo suggested that a natural gas explosion may have contributed to the fire. Specifically, he claimed that about one month before the fire, he called Boston Gas because he smelled a natural gas leak; contrary to other trial testimony, he claimed that Boston Gas personnel then came out to the store and fixed the leak. Santo further testified that there may have been paint and paint thinner in the store, as well as household detergents, that might have acted as an accelerant for the fire and would account for the peculiar burn patterns. Santo testified that on December 15, 1990, the day before the fire, the store was fully stocked. That night, he explained, he had closed the store between 5:00 p.m. and 6:00 -12- 12 p.m. and secured the front entrance. He insisted that he left the back door fully secured and that he retained in his possession the only set of store keys. He then went to his home in Dorchester. The next morning, around 6:00 a.m., he received a call at home informing him of the fire. He walked to the store (his car was not operational), arriving around 8:00 a.m.. Santo further testified that, upon his arrival at the fire scene, he saw ten to fifteen people in and around the burned store, including people from Boston Gas, and Greenaway's son. He said the people were removing half- burned items from the store. He admitted at trial that he had never previously mentioned his observance of the looters, even to the insurance company. He also testified that he did not attempt to stop the looting because the merchandise taken was, in any event, ruined. Santo admitted that, although he did not speak or understand English and had to rely on Virgilio for translation, he fully understood his actions when he signed the lease to the store, the business certificate, the alarm system contract, and the insurance claim for $48,000 in lost inventory. Santo denied removing, or asking anyone to remove, the merchandise from Brothers Fashions before the fire. He also denied lighting the fire or asking anyone to light the fire. -13- 13 The defendants painted a picture of a prosperous store that earned some $600 to $1000 in retail sales per day, suggesting the absence of a motive to collect insurance proceeds. The defendants also attempted to establish the bias of various trial witnesses. For example, they produced (contradicted) evidence of the unlawful absence of smoke detectors in the duplex, suggesting that the owner had her own motive to collect insurance proceeds. The defendants also suggested that the carpenter Greenaway was biased because he had married the owner's niece in 1990 and, upon the owner's death, the owner's niece stood to inherit the building. B. Arson and Conspiracy Counts, Analysis _________________________________________ 1. Relevant Law ________________ To prove a violation of 18 U.S.C. 844(i), the government must establish that the defendants: (1) maliciously damaged or destroyed, or attempted to damage or destroy, (2) by fire or an explosive, (3) a building or personal property used in interstate commerce or in any activity affecting interstate commerce. The government sought to prove that Virgilio set the fire, and Santo either aided and abetted him, or reasonably could foresee that Virgilio would set the fire in furtherance of an unlawful conspiracy. -14- 14 To prove aiding and abetting on the part of Santo, the government had to prove that Virgilio committed the arson, and that Santo associated himself with, and participated in, the arson "as something he wished to bring about, and sought by his actions to make it succeed." United ______ States v. Loder, 23 F.3d 586, 590-91 (1st Cir. 1994) ______ _____ (internal quotation marks and citations omitted); see Nye & ___ _____ Nissen v. United States, 336 U.S. 613, 619 (1949). ______ ______________ Alternatively, to convict Santo of the substantive arson offense, the government had to establish that Virgilio's setting of the fire was a foreseeable act done in furtherance of their unlawful conspiracy. See Pinkerton v. United ___ _________ ______ States, 328 U.S. 640, 647 (1946). ______ To prove the underlying conspiracy -- a predicate to Santo's Pinkerton liability as well as a substantive count _________ in the indictment -- the government needed to establish the defendants' knowledge and voluntary participation in the agreement, and an overt act in furtherance of it. See United ___ ______ States v. Sawyer, 85 F.3d 713, 742 (1st Cir. 1996). "The ______ ______ agreement need not be explicit; a tacit agreement will suffice." Id. To establish voluntary participation, the ___ government must prove both the intent to agree and the intent to effectuate the object of the conspiracy. See id. Of ___ ___ course, direct evidence is not required to prove either the agreement (which may be inferred from circumstances) or the -15- 15 defendants' participation in it. See id.; United States v. ___ ___ ______________ Moran, 984 F.2d 1299, 1300 (1st Cir. 1993). _____ 2. Application _______________ The evidence more than adequately established that someone deliberately torched Brothers Fashions with the aid _______ of an accelerant. Further, there is little question that the store was used in an activity affecting interstate commerce both because it was a rental property, and because the merchandise purchased for resale moved in interstate commerce. See United States v. DiSanto, 86 F.3d 1238, 1247- ___ _____________ _______ 48 (1st Cir. 1996) (holding that "rental property is per se ___ __ sufficiently connected to interstate commerce" for purposes of 844(i)) (explaining further that the jurisdictional element is met where restaurant received food supplies that travelled in interstate commerce); see also Russell v. United ___ ____ _______ ______ States, 471 U.S. 858, 862 (1985). ______ The more troubling question is whether or not the evidence sufficiently proved that Santo and Virgilio were the parties criminally responsible for the fire. We note that the case against the defendants is largely circumstantial. Circumstantial evidence does not represent the proposition in question, but asserts "'something else, from which the trier of fact may either (i) reasonably infer the truth of the proposition, . . . or (ii) at least reasonably infer an increase in the probability that the proposition is in fact -16- 16 true.'" U.S. v. Clotida, 892 F.2d 1098, 1104 (1st Cir. 1989) ____ _______ (quoting 1 D. Louisell & C. Mueller, Federal Evidence 94 ________________ (1977)). Although circumstantial evidence requires an inferential step in its proof, there is "no legal distinction" between circumstantial and direct evidence in the context of a Rule 29 motion. Id.; see Olbres, 61 F.3d at ___ ___ ______ 971. We recognize that "the government's proof may lay entirely in circumstantial evidence," United States v. ________ _______________ Valerio, 48 F.3d 58, 63-64 (1st Cir. 1995); we are, however, _______ "loath to stack inference upon inference in order to uphold the jury's verdict." Id. ___ The government produced direct evidence that Santo had in his possession the only keys to the store on the night of the fire, that the store's back door, rarely opened, was open at the time of the fire, and that Brothers Fashions had been emptied of almost all merchandise at that time. The jury thus could rationally infer that, because only Santo had the means to access the store that evening, he opened the back door from the inside of the store sometime before the fire. Santo's exclusive access also permits the conclusion that he was involved with the removal of the store's merchandise before the fire. The jury could infer that his new and uncorroborated testimony about looters was a fabrication to account for the lost merchandise -- a -17- 17 fabrication intended to cover up his knowledge of and involvement in its removal. The jury could conclude that Santo lied when he testified that he discontinued activating the security alarm shortly before the fire because of rats. From this untruth, the jury could infer that Santo's unexpressed reason for failing to engage the alarm was to nullify its ability to detect both the removal of merchandise and the fire. The jury could further find that Santo lied when he stated that he left the store's back door secured on the night of the fire and that, in fact, he left it open for Virgilio to set the fire. A jury could rationally infer that Virgilio personally set fire to Brothers Fashions. Virgilio, the only apartment tenant injured by the fire, had severe burns on his ankles, consistent with direct and prolonged exposure to flame; yet Frederico, who exited the building in the same manner and through the same area as claimed by Virgilio, testified that he was not injured in any manner and that he did not encounter any fire until he reached the sidewalk in front of the building, where he viewed the fire emanating from the store. The jury could also choose not to credit Virgilio's unembellished and confused account of the cause of the injuries to his face and body and infer that, in fact, he -18- 18 suffered those injuries escaping the store (perhaps out the small back door) after lighting the fire. The jury could further find that Santo lied when testifying that: (1) he had nothing to do with the removal of the store's contents, (2) he observed looters at the store the morning after the fire, and (3) Boston Gas repaired a gas leak at the store one month before the fire. The jury could also conclude that Virgilio lied about the source of his injuries. Lies such as these legitimately support a finding of guilt. See United States v. Hadfield, 918 F.2d 987, 999 ___ _____________ ________ (1st Cir. 1990) (finding inference of guilt could have been bolstered by defendant's "tall tale"); United States v. ______________ Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989) (explaining _____________ that the jury's disbelief of defendants' story allows legitimate inference "that the fabrication was all the more proof of their guilt"). As to motive, although the government did not produce evidence that Brothers Fashions was a failing business,3 the defendants clearly stood to gain from the insurance proceeds. Moreover, the jury could have given due weight to the fact that the defendants did not have insurance for the first nine months of the store's operation, obtained it only six weeks before the fire, and expressed peculiar concern about claim payments and proof of loss requirements.  ____________________ 3. Santo did, however, owe $14,000 to his brother, William. -19- 19 Further, the fire occurred just four days before the due date of the first installment payment, but after the down payment had already triggered coverage. In sum, although not overwhelming, the evidence was sufficient to prove beyond a reasonable doubt that (1) Santo and Virgilio conspired to set afire Brothers Fashions, (2) Virgilio set the fire, (3) Santo assisted Virgilio in this task by providing access to the store and by failing to engage the alarm, and (4) Santo reasonably could foresee that Virgilio would set the fire in furtherance of the conspiracy. Although the evidence does not compel a finding of guilt, it ______ need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt." United States v. Laboy, 909 F.2d 581, 588 (1st Cir. 1990). ______________ _____ The jury was "free to choose among reasonable constructions of evidence," id., and the trial evidence, as a whole, ___ permits a conclusion of guilt beyond a reasonable doubt. See ___ id. We cannot say that the jury's verdict on the arson and ___ conspiracy counts was irrational. C. Mail Fraud ______________ Little discussion of this count is necessary. To prove mail fraud, the government must establish: "(1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails . . . in furtherance of the scheme." -20- 20 Sawyer, 85 F.3d at 723. There was more than adequate ______ evidence to prove that Santo and Virgilio intentionally agreed to collect insurance proceeds fraudulently, and together submitted, by mail, a false insurance claim for merchandise they knew had not been lost in the fire. We will not disturb the jury's verdict on this count. II. II. ___ Motion for New Trial Motion for New Trial ____________________ The defendants alternatively challenge the district court's denial of their new trial motions, claiming that, on the weight of the evidence, their convictions constituted a miscarriage of justice. A district court's power to order a new trial is greater than its power to grant a motion for acquittal. See United States v. Rothrock, 806 F.2d 318, 318 ___ _____________ ________ (1st Cir. 1986). In considering a new trial motion, the court may consider both the weight of the evidence and the credibility of witnesses. See id. at 321. Where a new trial ___ ___ motion is based upon the weight of the evidence, the court may not order a new trial "unless it is quite clear that the jury has reached a seriously erroneous result." See id. at ___ ___ 322 (internal quotation marks and citations omitted). We review the district court's ruling on a new trial motion for abuse of discretion. See id.  ___ ___ True, the trial evidence was in conflict. The jury, however, was not compelled to credit Virgilio's account -21- 21 of the manner in which he was injured, or Pablo and Frederico's testimony that fire-fighters forcibly entered the store's back door. The jury could have agreed with Virgilio's argument that, given the evident powerful explosion in the store, his injuries would have been more severe, or worse, he would not have survived had he been the arsonist. The jury was warranted, however, in rejecting this theory. The strongest competing theory of innocence concerns Santo's involvement in the arson. Put simply, the jury could have reasonably found that Santo knew nothing of the fire before its occurrence, but acted as an accessory after the fact both to protect Virgilio and to profit from fraudulently obtained insurance proceeds. Santo insisted in his testimony, however, that he had the only means of access to the store on the night of the fire and that he left the back door secured that evening. In contrast, the government produced direct, credible evidence that the back door was not ___ closed at the time of the fire; while the jury might have found that Virgilio opened the door, or, perhaps, that the explosion blew the door open (although no witness opined as such), given Santo's staunch refusal to allow for the possibility that someone else may have had access to the store, the jury could and did plausibly find that Santo opened the door. The evidence that Santo obtained insurance -22- 22 coverage and disengaged the alarm shortly before the fire constitutes further proof of his prior knowledge of, and involvement in, the arson-for-profit scheme. Finally, other than generally to deny any involvement with the arson, Santo's trial testimony did nothing to support the theory that he was an unwitting dupe in Virgilio's criminal plan. The largely circumstantial nature of the proof in this case gave rise to competing plausible inferences, some pointing to guilt and others to innocence. The jury is charged with choosing between such inferences, see Olbres, 61 ___ ______ F.3d at 972, and, having had the opportunity to observe Santo's trial testimony and demeanor, it saw fit to convict him on all counts. While reasonable people could have found otherwise, "a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result." Rothrock, 806 F.2d at 322. Because we ________ cannot say the jury reached a seriously erroneous result, we find no abuse of discretion in the court's carefully considered refusal to grant Santo or Virgilio a new trial. III. III. ____ Jury Composition Jury Composition ________________ For the first time on appeal, Virgilio complains of the absence of minority jury members, suggesting an unconstitutionally disproportionate ethnic representation in the jury venire. We consider Virgilio's unadorned and -23- 23 perfunctory appellate arguments waived. See United States v. ___ _____________ Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that _______ undeveloped appellate arguments are deemed waived). Moreover, not only did he fail timely to raise the issue below, his assertions on appeal are, in any event, inadequate to meet his burden on the issue. See United States v. Pion, ___ _____________ ____ 25 F.3d 18, 22 (1st Cir. 1994) (explaining elements of prima facie case of unconstitutional disproportionality).4  IV. IV. ___ Other Asserted Trial Errors Other Asserted Trial Errors ___________________________ Virgilio contends that the prosecutor asked two questions of Pablo Ruiz that were calculated to inflame ethnic prejudice in the jury. Some context is in order. Pablo testified that, although he received many years of education in the Dominican Republic and earned an advanced degree in agriculture, he could not find work in the United States because he did not speak English. When later asked by the prosecutor how he could remember at trial the time he went to bed on the night of the fire (some three-and-a-half years earlier) Pablo replied, "Well, if I can remember what I studied during 23 years, I should be able to remember a part of what happened that night."  ____________________ 4. Virgilio also suggests that three of the jury members were biased because they had relatives in the insurance industry. Because Virgilio failed to raise the issue below, and fails adequately to develop it on appeal, we decline to address it. -24- 24 After further questioning about the fire events, during which Pablo's credibility was called into question by various inconsistencies, the prosecutor rekindled the subject of Pablo's inability to find agricultural work in the United States. The following exchange ensued: [The Prosecutor]: What about California, . . . you ever tried to get a job in agriculture in California? [Court overrules the objection and directs the witness to answer yes or no] [Pablo Ruiz]: No. [The Prosecutor]: What about Texas, did you ever -- [Court sustains objection].5 In its post-trial order denying the defendants motions for acquittal and new trial, the district court found that "the now disputed cross-examination of Pablo Ruiz was proper, did not constitute a racist appeal to the jury, and, when viewed in context, was not material in any event." We agree. We have warned that "courts must not tolerate prosecutors' efforts gratuitously to inject issues like race and ethnicity into criminal trials." United States v. ______________ Saccoccia, 58 F.3d 754, 774 (1st Cir. 1995), cert. denied, _________ _____ ______ 116 S. Ct. 1322 (1996). To the extent the disputed questions here unnecessarily (albeit marginally) invited ethnic or cultural prejudice, we strongly disapprove. While, however,  ____________________ 5. Defense counsel did not press for any further redress. -25- 25 the inquiries may have been of borderline relevance and materiality, it was Pablo who initially offered the explanation that his inability to speak English precluded his employment in the field for which he was most qualified. Under the circumstances of this case, we cannot say that the prosecutor impermissibly injected into the trial a harmful appeal to any ethnic bias in the jury by asking these two questions. See id.6 ___ ___ Virgilio also claims that the prosecutor frequently "bellowed offensively at defense testimony" and "screamed at the jury with totally inappropriate accompanying facial moues and flailing gesticulation." Virgilio did not raise any objection to the prosecutor's style or manner at trial. In its post-trial order, the district court found that, "while the prosecutor's closing argument was loudly and passionately delivered, it did not exceed the bounds of propriety." Having failed on appeal to develop his argument or explain, with any detail, how the prosecutor's conduct prejudiced the trial, Virgilio cannot prevail on this challenge.7  ____________________ 6. We also note that the district court carefully instructed the jury, at some length, that it must not draw any adverse inference from the fact that the defendants were from the Dominican Republic and were not native English speakers. 7. To the extent Virgilio suggests on appeal that his trial counsel rendered ineffective representation, that challenge is not properly before us. United States v. Martinez- ______________ _________ Martinez, 69 F.3d 1215, 1225 (1st Cir. 1995) (explaining that ________ an ineffective assistance of counsel claim on direct appeal will not lie absent a sufficiently developed record), cert. _____ -26- 26 V. V. __ 18 U.S.C. 844(h)(1): Use of Fire to Commit Federal Felony 18 U.S.C. 844(h)(1): Use of Fire to Commit Federal Felony ___________________________________________________________ The defendants also challenge their convictions and sentences under 18 U.S.C. 844(h)(1), which provides, in relevant part: "Whoever . . . uses fire or an explosive to commit any [federal] felony . . . shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 5 years but not more than 15 years. . . ." The indictment charged Santo and Virgilio with using fire to commit mail fraud, a violation of 18 U.S.C. 1341. The defendants claim, however, that "fire" was not used "to commit" mail fraud, but rather, the "mailing of articles" was used to commit mail fraud. They contend that fire may have been used to commit the arson, "but it was not the letter, _____ envelope or stamp, or handwriting/printing/typing used to commit mail fraud." In the past, we have implicitly assumed the legal conclusion that defendants now challenge. See, ___ e.g., United States v. Lombardi, 5 F.3d 568, 569 (1st Cir. ____ _____________ ________ 1993) (involving 844(h)(1) conviction for using fire to  ____________________ denied, 116 S. Ct. 1343 (1996). Further, to the extent ______ Virgilio submits new evidence in support of his request for new trial, that evidence must be brought to the attention of the district court in the first instance, either in a timely motion pursuant to Fed. R. Crim. P. 33, or on a writ of habeas corpus pursuant to 28 U.S.C. 2255. -27- 27 commit mail fraud where defendant arranged arson fraudulently to secure insurance proceeds).8 Defendants' challenge calls into question the meaning of the phrase "uses fire . . . to commit [certain crimes]." We have not previously been presented with this issue. We begin our analysis with the statute's language. See Bailey v. United States, 116 S. Ct. 501, 506 (1995). ___ ______ _____________ Because the word "use" is not defined by statute, we "construe it in accord with its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993); see Bailey, _____ _____________ ___ ______ 116 S. Ct. at 506. The word is "variously defined as '[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'" Bailey, 116 S. Ct. at 506 (quoting Smith, 508 U.S. at 228-29 ______ _____ (internal quotation marks omitted) (citing Webster's New International Dictionary of English Language 2806 (2d ed. 1949) and Black's Law Dictionary 1541 (6th ed. 1990))). We think it plain that the defendants "used" fire to commit mail fraud within the meaning of 844(h)(1).9 The  ____________________ 8. We also note that the government has frequently charged a 844(h)(1) offense in connection with mail fraud, specifically where a defendant sought to secure insurance proceeds for property he had burned. See, e.g., United ___ ____ ______ States v. Lombardi, 5 F.3d 568, 569 (1st Cir. 1993); United ______ ________ ______ States v. Bennett, 984 F.2d 597, 604 (4th Cir. 1993); United ______ _______ ______ States v. Schriver, 838 F.2d 980, 981 (8th Cir. 1988). ______ ________ 9. Defendants also challenge the sufficiency of the evidence underlying this count. For the reasons discussed above concerning the arson, conspiracy and mail fraud counts, we -28- 28 defendants set fire to Brothers Fashions "to carry out" their scheme to deceive the insurance company into making payment for claimed losses. Specifically, the fire constituted "the means" by which the defendants attempted to create the appearance of a legitimate loss of insured items. While the defendants also "used" the mails in furtherance of the scheme to defraud, that does not diminish the fact that, additionally, they "employed" or "availed themselves of" fire to effect their scheme. Cf. Smith, 508 U.S. at 230 __ _____ (explaining that including one method of "us[ing] a firearm" does not result in excluding others). Finally, the defendants make no argument that the placement and purpose of the word "use" in its statutory context undermine the applicability of 844(h)(1) here. See Bailey, 116 S. Ct. at ___ ______ 506-07 (considering disputed language in the context of  ____________________ find the evidence sufficient to permit a jury to find that Santo and Virgilio used fire to commit mail fraud. -29- 29 overall statutory scheme). No basis for such an argument is apparent.10 In conclusion, we see no basis to overturn the defendants' convictions and attendant penalties under 18 U.S.C. 844(h)(1). VI. VI. ___ Sentencing Guideline Challenge Sentencing Guideline Challenge ______________________________ Defendants appeal the court's application of the federal arson guideline. See U.S. Sentencing Guidelines ___ Manual [hereinafter "U.S.S.G."] 2K1.4(a)(1)-(4) (1994).11 In the sentencing context, we review factual determinations, which must be supported by a preponderance of the evidence, for clear error. See United States v. McCarthy, 77 F.3d 522, ___ _____________ ________ 535 (1st Cir.), cert. denied, 117 S. Ct. 479 (1996), and _____ ______ ___ cert. denied, 65 U.S.L.W. 3505 (U.S. Jan. 21, 1997) (No. 96- _____ ______ 5017). We review de novo sentencing issues involving __ ____ questions of law, including the applicability of a relevant  ____________________ 10. Moreover, the legislative history of the Anti-Arson Act of 1982, which amends 844(h)(1) and other statutory sections, strongly suggests Congress' recognition, in the context of this statutory scheme, that one can "use fire" to effect a number of criminal purposes, specifically insurance fraud. See H.R. Rep. No. 678, at 2 (1982), reprinted in 1982 ___ _________ __ U.S.C.C.A.N. 2631, 2632 ("Fire is used extensively not only for the criminal purposes of extortion, terrorism and revenge, but to conceal other crimes such as homicide, and for fraud against insurance companies."). 11. Unless otherwise indicated, all guideline citations are to the November 1994 version of the United States Sentencing Commission Guidelines Manual, applied (without objection) by the district court. -30- 30 guideline. See id. Because the sentencing court enjoys a ___ ___ unique vantage point and has "special competence" in assessing the "ordinariness" of a case, we afford it substantial deference in departure decisions, which we review only for abuse of discretion. Koon v. United States, 116 S. ____ _____________ Ct. 2035, 2047 (1st Cir. 1996). The arson guideline provides for different base offense levels depending on the circumstances of the crime. Subsection (a)(1) of the guideline authorizes the application of a base offense level of 24 if: the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created ___________________________ knowingly; or (B) involved the _________ destruction or attempted destruction of a _________________________________________ dwelling. ________ U.S.S.G. 2K1.4(a)(1) (emphasis added). Subsection (a)(2) authorizes a lower base offense level, 20, if: the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense; (B) involved the destruction ___________ or attempted destruction of a structure _________________________________________ other than a dwelling; or (C) endangered ______________________ __________ a dwelling, or a structure other than a __________ dwelling. U.S.S.G. 2K1.4(a)(2) (emphasis added).12  ____________________ 12. The arson guideline commentary further provides, "Creating a substantial risk of death or serious bodily injury includes creating that risk to fire fighters and other emergency and law enforcement personnel who respond to or investigate an offense." U.S.S.G. 2K1.4, comment. (n.2). -31- 31 As indicated by the underscored language in the text of the arson guideline set forth above, the higher base offense level (24) is warranted under either the first prong of 2K1.4(a)(1) -- the knowing creation of a substantial risk of death or serious bodily injury ( 2K1.4(a)(1)(A)) -- or the second prong -- the destruction or attempted destruction of a dwelling ( 2K1.4(a)(1)(B)). The selection between this base offense level and the lower level (20) set forth in the subsequent section, 2K1.4(a)(2), depends upon either the defendant's mens rea (i.e., whether or not it was ________ "knowing") in creating the requisite risk, or the type of __ structure involved, i.e., dwelling or non-dwelling. If the fire involved a dwelling, the selection between the base offense levels depends on whether the defendant destroyed (or attempted to destroy) it, or merely endangered it. The defendants offered two rationales to the district court in support of an application of a base offense level of 20: (1) it is inconceivable that they would intentionally create a substantial risk of death or serious bodily injury to their family members living directly above Brothers Fashions; and (2) they did not destroy or attempt to destroy a dwelling, but rather, a store; and the upstairs ________ residences, only minimally damaged, were merely "endangered" incidentally to the arson offense. -32- 32 The government countered that a base offense level of 24 was warranted because, under the first prong of 2K1.4(a)(1), the defendants had only to "knowingly," not "intentionally," create the risk of death or injury. Moreover, the government argued, the defendants satisfied the "knowingly" requirement because they committed the arson at a time when they knew residents were in the very building to which they set fire. The government argued further that the second prong of 2K1.4(a)(1) warranted a level 24 because the defendants destroyed or attempted to destroy a dwelling. The district court observed that a pivotal question revolved around the meaning of the word "knowingly." 2K1.4(a)(1)(A). The court opined that the definition of "knowingly" was "a little bit ambiguous" in the context of the arson guideline. It first observed that, "[o]bjectively, a rational person perhaps should know that if he set the gasoline fire in the basement, people living above would be injured." The court, however, further stated that if it interpreted "knowingly" as "intentionally," it did not believe that Virgilio Ruiz intentionally put his brothers in danger; instead, the court observed, "I think subjectively he may have had the foolish, but sincere belief that this fire could be started, that everybody could be quickly evacuated -33- 33 or even that the dwelling where they lived would not be destroyed, just the store would be."13  The court then concluded: Well, I'll tell you what I'm going to do. I'm going to rate this as a 22. There is a preamble to the guidelines which I cannot find right [now] that says if something doesn't perfectly fit one category or another, it is permissible to interpolate. For example, there is a law that says if somebody is between a minor and minimal participant, you can reduce the role in the offense by 3 rather than 2 or 4 and, in [another case], I [had] to study the interpolation language at the beginning of the guidelines. It seems to me this is a [case] which generally falls between the two provisions, [ 2K1.4](a)(1) and (a)(2), essentially for the reasons [stated above]. And I think the fairest and legal[ly] most appropriate thing to do in the circumstances would be to interpolate and I'm going to rate this as a 22.14  ____________________ 13. The court appeared to find inapplicable the second prong of 2K1.4(a)(1) -- "destruction or attempted destruction of a dwelling." 2K1.4(a)(1)(B). The court observed that the circumstances of the arson appeared to involve the destruction of the store, and the endangering, but not the destruction, of the dwelling. In the apparent absence of an intent to destroy the whole building, the court impliedly found the "attempted destruction" alternative also inapplicable. The government challenges the factual underpinnings of this conclusion. Finding no clear error at this juncture, we leave this ruling undisturbed. 14. The court eventually adjusted Santo's base offense level downward, from 22 to 20, for being a "minor participant" in the offense, see U.S.S.G. 3B1.2(b), which, combined with ___ his criminal history category I, yielded a guideline range of 33 to 41 months. The court declined the government's request to increase Santo's offense level by two points for perjury. The court selected a 33-month prison term for the arson, conspiracy, and mail fraud counts, to be followed by the -34- 34 On appeal, the defendants contend that the district court erroneously "interpolated" when applying the arson guideline. They argue that if the court found inapplicable 2K1.4(a)(1), it should have affixed the lower base offense level provided for in 2K1.4(a)(2), rather than apply an intermediate level. The government does not appeal the ___ sentences as calculated, but nonetheless argues that the higher base offense level was clearly appropriate and that the defendants, who benefitted from the court's "interpolation" exercise, have no basis for complaint. The district court's use of "interpolation" to affix an intermediate base offense level was an apparent attempt to invoke a paragraph (now deleted) in the Introduction to the pre-November 1989 Guidelines Manual. See, e.g., U.S.S.G. 1A4(b) (1987). The Sentencing ___ ____ Commission had designated "interpolation" as a form of departure in which a sentencing court could choose an intermediate point "between two adjacent, numerically oriented guidelines rules." Id. Effective November 1, 1989, ___ however, the Commission deleted that interpolation provision,  ____________________ mandatory 60 month consecutive term for his conviction under 18 U.S.C. 844(h)(1) (using fire to commit a federal felony), for a total of 93 months' imprisonment. Virgilio's base offense level remained at 22, which, combined with a criminal history category I and the added 60 month consecutive term, yielded a total range of 93-111 months. On the government's recommendation, the court affixed a 108- month prison term for Virgilio. -35- 35 concluding "that it is simpler to add intermediate offense level adjustments to the guidelines where interpolation is most likely to be considered." U.S.S.G. App. C, Amendment 68 (1989). The Commission also stated, however: "This amendment is not intended to preclude interpolation in other cases; where appropriate, the court will be able to achieve the same result by use of the regular departure provisions." Id. ___ Thus, although the issue is somewhat unclear, it appears that interpolation between guideline rules is permissible where it could be properly justified under the normal departure procedures. Assuming that the court essentially effected a downward departure when affixing a base offense level of 22, we find that because the district court failed to make specific findings on the defendants' state of mind, we are unable to resolve either the defendants' contention that the facts warranted a level 20, or the government's argument that a level 24 was appropriate. Our inability to settle the sentencing issue absent such findings requires us to remand the case for further findings and resentencing. See United ___ ______ States v. Valencia-Lucena, 988 F.2d 228, 234-36 (1st Cir. ______ _______________ 1993) (remanding for resentencing where sentencing court failed to make reasonably specific findings concerning foreseeability of drug quantity); see also United States v. ___ ____ _____________ Olbres, 99 F.3d 28, 30, 32 (1st Cir. 1996) (remanding for ______ -36- 36 clarification of sentencing court's specific willfulness findings in context of downward departure). In United States v. DiSanto, 86 F.3d 1238, 1256 _____________ _______ (1st Cir. 1996), we stated:  Given the structure of the arson guidelines, we conclude that 2K1.4(a)(1)(A) requires that the ______________________ district court make a specific finding _________________________________________ that the defendant 'knowingly' created a substantial risk of death or serious bodily injury, as opposed to merely finding that defendant recklessly (or negligently) created such a risk which would more appropriately trigger application of [ 2K1.4(a)(2)] (emphasis added). Whether or not the defendant acted "knowingly" calls for an inquiry into his subjective state of mind when he created the requisite risk. See id. at 1255 (citing United States v. ___ ___ _____________ Karlic, 997 F.2d 564, 568-69 (9th Cir. 1993)). In this case, ______ the court explored the various possibilities of a "knowledge" finding, opining first that a rational person would know that setting such a fire would cause injury, then observing that Virgilio did not "intentionally" put others in danger because he "may" have had the "foolish but sincere belief" in a swift evacuation of the residents. In the end, the court did not make any specific findings on either of the defendants' state of mind but, instead, resorted to interpolation. The court's reluctance to make the requisite findings may have been the result of the somewhat unsettled definition in this circuit of the term "knowingly" in the -37- 37 arson guideline. See generally, DiSanto, 86 F.3d at 1256-58. ___ _________ _______ In DiSanto, we discussed at some length the possible _______ parameters of the word "knowingly." See id. at 1256-58. We ___ ___ explained that "'the hypothetical knowledge continuum' is marked by 'constructive knowledge' at one end and 'actual knowledge' at the other." Id. at 1257 (quoting United States ___ _____________ v. Spinney, 65 F.3d 231, 236-37 (1st Cir. 1995)). In between _______ these extremes lie various "gradations," including "notice of likelihood" and "practically certain." Id. Although we ___ expressed our inclination "to conclude that a showing of knowledge anywhere along this continuum satisfies application of 2K1.4(a)(1)(A)," we declined to determine the exact level of knowledge required for the guideline. Id. at 1257- ___ 58 (finding that government had established the somewhat high standard of defendant's awareness that the requisite risk was "practically certain"). Had the district court here actually found that the defendants acted knowingly when they created a substantial risk of death or serious bodily injury to someone other than themselves, we likely would have upheld the finding as not clearly erroneous, even under the stringent "practically certain" test. The evidence established that the defendants set fire to a building basement in the early hours of a winter morning, knowing that the residential units above were occupied. "It is difficult to imagine a clearer illustration -38- 38 of the knowing creation of a substantial risk of death or serious bodily injury." United States v. Honeycutt, 8 F.3d _____________ _________ 785, 787 (11th Cir. 1993) (finding requisite level of knowledge where defendant, having seen people inside tavern, threw a Molotov cocktail at the outside corner of the building) (using "practically certain" test). The sentencing court, however, must make such a finding in the first instance, and we will not engage in that initial exercise on appeal. Because we remand this case for findings and resentencing, we think it necessary to clarify further the definition of "knowingly" appearing in subsection (a)(1), but not (a)(2), of the arson guideline. See U.S.S.G. 2K1.4. ___ The guideline's structure "clearly suggests that there must be a meaningful distinction between the two sections." DiSanto, 86 F.3d at 1256. As we noted in DiSanto, 86 F.3d at _______ _______ 1257, the Ninth and Eleventh Circuits have adopted the Model Penal Code's definition of "knowingly."15 In those circuits, "a defendant can be found to have 'knowingly' created a substantial risk of death or serious bodily injury under 2K1.4 only if the defendant was aware that a substantial _____ risk of death or serious bodily injury was 'practically ___________  ____________________ 15. The Seventh Circuit has also approvingly cited the Model Penal Code's definition of knowingly in this context. See ___ United States v. Altier, 91 F.3d 953, 957 (7th Cir. 1996) _____________ ______ (distinguishing "knowingly" from "purposefully"). -39- 39 certain' to result from the criminal act." Karlic, 997 F.2d _______ ______ at 569 (emphasis added); accord Honeycutt, 8 F.3d at 787; see ______ _________ ___ also Model Penal Code 202(2)(b) (1985).16 ____ ________________ We agree with our sister circuits that the Model Penal Code's definition gives due regard to the "meaningful distinction" between the pertinent guideline sections. Indeed, we have already held that a "practically certain" finding, which is akin to, but something less than, actual knowledge,17 satisfies the definition of "knowingly."  DiSanto, 86 F.3d at 1257-58. Thus, we adopt the Model Penal _______ Code absent a contrary guidelines definition. We acknowledge our earlier inclination to include all gradations of the knowledge continuum in this context. Id. at 1257. To the ___ extent, however, that "constructive knowledge" requires only  ____________________ 16. The Model Penal Code's definition of "knowingly" provides that: A person acts knowingly with respect to a material element of an offense when: . . . (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result. Model Penal Code 2.02(2)(b) (1985). The Model Penal Code ________________ further states that "[w]hen knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes it does not exist." Id. at 2.02(7). ___ 17. We have equated "actual knowledge" with "certain knowledge." Spinney, 65 F.3d at 237. _______ -40- 40 that the defendant either have had a "notice of likelihood"18 or "should have known" of a substantial risk, see id. at ___ ___ 1257-58 n.30; Spinney, 65 F.3d at 236-37, we now think _______ something more is needed. For the purposes of the arson guideline, these particular "constructive knowledge" formulations appear to establish only "recklessness" or "negligence," both insufficient to trigger the higher base offense level. See DiSanto, 86 F.3d at 1256. ___ _______ On remand, the district court should articulate specific findings of each defendant's state of mind regarding the creation of the risk. In order for the higher offense level to apply, the court certainly need not find that the defendants "purposefully" or "intentionally" created a substantial risk of death or serious bodily injury. Rather, the court need find only that Virgilio and Santo actually knew that they created such risk, or were aware that the risk was practically certain. If, on the other hand, the court supportably finds that one or both of them actually believed that no substantial risk was created under the circumstances, a finding of knowledge would not be warranted. See DiSanto, ___ _______ 86 F.3d at 1257 n. 29 (citing Model Penal Code 2.02(7)(1985), which provides that a defendant's actual  ____________________ 18. We have previously characterized this gradation as "an enhanced showing of constructive knowledge." Spinney, 65 _______ F.3d at 237. -41- 41 belief in the nonexistence of a fact precludes knowledge finding). VII. VII. ____ Conclusion Conclusion __________ For the foregoing reasons, we affirm the ______ defendants' convictions, vacate their sentences and remand ______ ______ for resentencing. -42- 42