# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2651

_____

United States of America

*Plaintiff - Appellant*

v.

Kenneth Vaughn Knight

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: June 12, 2015
Filed: September 1, 2015

_____

Before GRUENDER, BEAM, and BENTON, Circuit Judges.

_____

BEAM, Circuit Judge.

A jury convicted Kenneth Vaughn Knight of conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C. §§ 371 and 157; aiding and abetting bankruptcy fraud, in violation of 18 U.S.C. §§ 152(7) and 2; aiding and abetting the making of a false statement in relation to a bankruptcy case, in violation of 18 U.S.C. §§ 152(3) and 2; and five counts of aiding and abetting money laundering, in violation of 18 U.S.C.

§§ 1957 and 2. Knight subsequently filed a timely motion for judgment of acquittal or new trial on all counts of conviction. The district court[1] granted Knight a new trial on the conspiracy, bankruptcy fraud, and money laundering counts, granted his motion for judgment of acquittal on the false statement count, and conditionally granted him a new trial on the false statement count in the event we were to reverse the court's judgment of acquittal. The government appeals. We reverse the district court's judgment of acquittal on the false statement charge but affirm its decision to grant Knight a new trial on all counts of conviction.

## I.    BACKGROUND

Knight is a licensed attorney, and the charges against him stem from actions he took in connection with his representation of a client, Brandon Barber, during a time period from early 2008 through 2010. On July 31, 2009, Barber, with Knight as his attorney, filed for Chapter 7 bankruptcy. Over the next several months, Barber filed multiple supplements to his bankruptcy petition that the government alleged contained blatantly false information designed to conceal Barber's assets from his creditors and the bankruptcy court. Of particular note, Barber claimed in his Statement of Financial Affairs (SOFA) that his income for 2008 was approximately $4,000. The government, however, contends that in 2008 Barber earned several million dollars of personal income from several real estate deals and that he passed roughly $1.2 million of this money through Knight's Interest on Lawyer's Trust Account (IOLTA) for the purpose of hiding the income during Barber's bankruptcy proceeding. Over the course of a nine-day trial, the government presented testimony from dozens of witnesses and introduced substantial documentary evidence in an effort to prove that Knight knowingly helped Barber hide his assets prior to and during the bankruptcy proceeding. However, in its order granting Knight a new trial,

---

[1]The Honorable P.K. Holmes, III, Chief Judge, United States District Court for the Western District of Arkansas.

the district court exhaustively discussed and weighed the government's evidence and ultimately concluded that the evidence presented "largely invited only speculation and conjecture" and was plagued by gaps that "were too large to be reasonably filled by inference without leaving some doubt as to the correctness of the verdict."

## A. Barber's and Knight's Pre-Bankruptcy Activities

During the mid-2000s Barber was a high profile figure in the northwest Arkansas real estate market and was known for his lavish lifestyle. In 2007, Barber's real estate practice began to crumble due to the combination of a weak real estate market and poor business decisions by Barber. Barber temporarily kept his various businesses, including the Barber Group[2] and Lynnkohn, LLC (Lynnkohn),[3] afloat largely through loans. However, because Barber had no way to repay the loans, he quickly found himself deeply mired in debt. Barber's dire financial situation became public in late 2007, when Legacy National Bank of Springdale, Arkansas (Legacy Bank), initiated foreclosure proceedings in state court related to a $16.7 million loan it made to Lynnkohn to finance the construction of a high-rise condominium building in downtown Fayetteville, Arkansas (the "Legacy building"). Barber was a personal guarantor on the loan and was named as a party to the foreclosure action. In the wake of the Legacy Bank foreclosure action, numerous creditors began to sue Barber and/or his companies.

In January 2008, Barber hired Knight to help advise him on various options available to Barber to resolve his financial problems, including bankruptcy.[4] Barber

---

[2]The Barber Group was a business entity that Barber used for most of 2008 in running the day-to-day operations of his real estate development business.

[3]Lynnkohn was an investment company that Barber co-owned.

[4]The record indicates that Knight had some prior experience representing clients in bankruptcy. However, there is no evidence that Knight had represented a

decided not to immediately file for bankruptcy, and several government witnesses testified that Barber was quite adamant that he intended to resolve his debts and avoid bankruptcy. The record indicates that Barber quickly racked up substantial legal fees as Knight represented Barber in numerous lawsuits against Barber and his various entities, particularly Lynnkohn. Knight subsequently agreed to represent Barber for a monthly fee of $17,000. The record indicates that in 2008 Barber and/or his business entities paid Knight over $200,000.

One of the first legal matters that Knight helped Barber address was the Legacy Bank foreclosure action. In late February 2008, Knight sent Barber an email in which Knight suggested that they use a potential bankruptcy filing as a bargaining chip in negotiating down the Legacy Bank debt. Around the same time, Knight sent an email to Barber in which he encouraged Barber to have his personal property appraised. Knight further indicated that they should let the "WHOLE WORLD" know about the appraisal because this would signal that he was considering bankruptcy, which would strengthen his negotiation position with creditors. There is also evidence that in early 2008, Barber, Knight and several of Barber's business partners discussed the possibility that Barber might eventually have to file for bankruptcy in order to "protect himself." At some point, Knight also advised Barber to empty out accounts he held with banks to which he owed money.

### 1. Real Estate Transactions and Barber's Use of IOLTA

Between March 2008 and October 2008 Barber and/or his entities participated in three real estate transactions that netted income or loan proceeds. These transactions are relevant primarily due to Knight's (seemingly) limited involvement in them and because some of the proceeds derived from these deals passed through

---

client whose finances were nearly as complicated as Barber's turned out to be.

Knight's IOLTA. Barber also made additional uses of Knight's IOLTA that are discussed in more detail below.

In March 2008, Barber participated in a complicated transaction (the "Ballpark Transaction") involving a forty-acre tract of property (the "Ballpark Property") located near the ARVEST baseball stadium in Springdale, Arkansas. The Ballpark Transaction was a "land flip" deal in which Barber, through one his entities, EIA International, LLC (EIA), purchased the Ballpark Property and on the same day sold the property at a $1.2 million profit to a third-party business entity owned by Barber's associate, Bob Gaddy. Gaddy received roughly $435,000 of EIA's profit, and EIA also agreed to cover some of the loan costs and other expenses that Gaddy's entity incurred in purchasing the property. The remaining proceeds from the Ballpark Transaction were the subject of a series of complicated deals EIA entered into with Epsilon Investments, LLC (Epsilon), which was a business entity partially owned by Barber's childhood friend, James Van Doren. Barber apparently wanted to generate a loss to offset the gain he anticipated receiving from the Ballpark Transaction. He tried to accomplish this goal via a series of debt-shifting moves involving Epsilon, EIA, and other entities that Barber owned. By the time the dust settled, Epsilon and EIA had executed a settlement agreement and an escrow agreement (the "Escrow Agreement") that required $688,937 of the Ballpark proceeds be placed in escrow (the "Escrowed Funds"). Roughly $122,000 of the Escrowed Funds were to be paid out to Epsilon and Van Doren. The remaining funds were to be disbursed to EIA in allotted amounts after EIA completed and sold four properties that were the subject of a separate contract between Epsilon and a different Barber-owned entity.

The record contains scant evidence of Knight playing any role in negotiating or structuring the Ballpark Transaction.[5] Instead, another attorney, Ken Hall, created

___

[5]Although Van Doren testified that Knight was "intricately involved" in the deal, on cross-examination Van Doren admitted that he had no personal knowledge

-5-

EIA, structured and negotiated the Ballpark Transaction as well as the various side deals between EIA and Epsilon that Barber used to generate a loss. Hall was also slated to be the agent for the Escrowed Funds. However, on the day before the Ballpark Transaction was scheduled to close, Hall abruptly cut off his involvement with the deal based on some vaguely-defined concerns. Barber made arrangements for a third party to handle the closing and, at Hall's suggestion, asked Knight to serve as the agent for the Escrowed Funds. Knight agreed to do so and, at Barber and Van Doren's request, made a few minor changes to the Escrow Agreement. On March 31, 2008, the Ballpark Transaction closed. The closing documents indicate that $688,937 of the proceeds were paid out to Epsilon, in care of Knight Law Firm. The record further reflects that $688,937 was transferred into Knight's IOLTA and that, as agreed upon by Epsilon and EIA, Knight transferred approximately $90,000 to Epsilon and $32,000 to Van Doren.

On the same day that the Ballpark Transaction closed, First State Bank force-closed fourteen bank accounts held by Barber personally or by his entities. Barber apparently begged Knight to let him place the funds from the force-closed accounts, totaling approximately $53,000, into Knight's IOLTA because Barber had no other accounts available, was flying out to New York that same afternoon, and needed to pay several business expenses, including the Barber Group's payroll. Knight allowed Barber to transfer the funds into his IOLTA and, at the direction of Barber and one of Barber's employees, Christy Bennett, issued several checks, totaling approximately $14,000 to pay for a variety of Barber's business expenses. The record indicates that approximately one to two weeks later, Knight learned that Bennett had opened a new business account for the Barber Group. However, on the day that he learned of the new account, Knight issued a $15,000 check to the Barber Group and a $21,000 check to Barber, which apparently exhausted the funds from the previously force-

---

of any work Knight did on the deal and that he assumed Knight was involved because Knight worked with Barber on many matters.

closed accounts that Barber placed into Knight's IOLTA. Between early April 2008 and late May 2008, Knight also disbursed virtually all of the Escrowed Funds. Records from Knight's IOLTA indicate these funds were used to pay various expenses EIA incurred in relation to the Ballpark Transaction, Knight's legal fees, debts owed by other Barber-owned entities, or were disbursed directly to the Barber Group at the direction of Barber or Bennett. The record also indicates that Knight used IOLTA funds to pay some of Barber's business debts in order to keep Barber's creditors from learning that he had funds available. In addition, Barber and Knight discussed using IOLTA funds to pay off a large debt that Barber may have personally owed. However, it does not appear that IOLTA funds were used to pay this debt. Bennett testified that after Barber exhausted the Escrowed Funds, he again began "thinking about" filing for bankruptcy.

In June 2008, Barber pulled together a second land flip deal with Gaddy (the "Spring Creek Transaction") involving a property owned by Jeff Whorton. Whorton sold the property to EIA, who then flipped it to a Gaddy-owned entity for a $900,000 profit. EIA, however, never received any money from this deal. Instead, approximately $500,000 of the proceeds were paid to Gaddy, and Barber personally received $390,204. However, Barber also signed an indemnification agreement with Gaddy in which Barber agreed to pay a portion of the financing costs associated with the Spring Creek Transaction and to execute a promissory note in an amount equal to the payout Barber received from the deal, effective upon default. The record indicates that Barber subsequently executed a promissory note in favor of Gaddy in the amount of $390,204. From these proceeds, Barber obtained two cashier's checks, one for $50,000 payable to Knight for legal fees, and one for $340,204 payable to Barber. There is scant evidence that Knight played any substantive role in negotiating or structuring the Spring Creek Transaction, although it does appear that he was aware of the deal shortly before it closed.

On June 5, 2008, Barber deposited the $340,204 cashier's check into a personal account he held at Priority Bank. On June 25, 2008, Barber, at Knight's advice, deposited a $21,612 cashier's check from his Priority Bank account into Knight's IOLTA so that Knight could pay interest obligations EIA and Epsilon owed related to the Ballpark Transaction. Email communications between Knight and Barber indicate that Knight made these payments on EIA's and Epsilon's behalf so that Barber's creditors would not know that Barber was paying these debts.

Between June 2008 and August 2008, Barber moved his remaining proceeds from the Spring Creek Transaction through numerous bank accounts that he owned or controlled. On August 12, 2008, Barber transferred $191,000 of proceeds derived from the Spring Creek Transaction into the Knight Law Firm's business account. Knight kept $40,000 in fees and moved, at Barber's direction, the remaining $151,000 into his IOLTA. Knight testified that Barber asked him to hold this money in the IOLTA because Barber's bank accounts had been closed again. Over the next six weeks, Knight disbursed approximately $50,000 of IOLTA funds to the Barber Group or Lynnkohn. It appears the remaining funds were used to pay for Barber's personal expenses. Two transfers out of the IOLTA related to Knight's attempt to pay a roughly $95,000 debt that Barber owed on a personal credit card bill. These transfers are the subject of the money laundering charges in Counts 4 and 5 of the Indictment.

In October 2008, Barber received approximately $514,000 related to his role in helping Whorton sell six commercial lots that Whorton owned (the "Executive Plaza Transaction"). Barber arranged for two other individuals, Gary Combs and Brandon Rains, to purchase the lots. Whorton agreed to pay large, and apparently illegal, kickbacks to Combs and Rains. The parties also agreed that Whorton would pay Barber a $400,000 commission or finder's fee and that Combs would make a payment to Barber as well. It appears that Barber structured the key elements of the Executive Plaza Transaction and that Knight provided some minor assistance with the deal, including reviewing title and closing documents. The record contains little

direct evidence that Knight was familiar with the nuances of the deal or knew about the illegal kickbacks Whorton made to Combs and Rain.[6]

Knight did, however, have some knowledge about the payments Barber expected to receive from Whorton and Combs. Two days before the Executive Plaza Transaction was scheduled to close, Knight advised Barber to set up a new entity to take "the payments from Whorton and Combs" and suggested that they could "set it up so that you don't own 100% (better creditor protection)." The next day, Knight formed a company called NWARE Investments, LLC (NWARE), that Barber wholly owned. Van Doren testified that Barber claimed that NWARE was designed so that Barber could conduct business without creditors knowing that he had money. The record contains some evidence that corroborates Van Doren's description of NWARE's purpose. Specifically, it appears that Knight and Barber took some steps to distance NWARE from Barber's other business entities, including listing Bennett's home address as NWARE's physical address in the company's articles of organization, despite the fact that little-to-no NWARE-related activities occurred at Bennett's home. Further, as Van Doren suggested, it appears that Barber used NWARE for some legitimate business purposes as well.

The Executive Plaza Transaction closed on October 7, 2008. After the closing, Whorton wrote checks to Combs and Rains for the agreed upon kickbacks and also wrote a $394,000 check to NWARE.[7] Barber, however, did not deposit or cash the

---

[6]Whorton pleaded guilty in a separate case to conspiracy to commit bank fraud and money laundering in connection with his role in the Executive Plaza Transaction. Rains also pleaded to guilty to making a false statement to a federal agent in connection with the government's investigation of the Executive Plaza Transaction. Combs died before the criminal proceedings were initiated.

[7]Combs also directly made a $200,000 payment on Barber's mortgage for Barber's personal residence. There is no evidence that Knight knew about this particular payment, and the government did not press the issue.

check because it was written on Legacy Bank, and Barber was concerned that the bank would set off the funds if it realized that Barber owned NWARE. Barber therefore returned the check to Whorton and asked him to wire the check to Knight's IOLTA. At this time, Whorton negotiated the payment down to $314,000 and ultimately wired payment in this amount to Knight's IOLTA without conversing with Knight. Emails between Knight and Barber indicate that Knight knew that Whorton planned to transfer money into the IOLTA. These emails further suggest that Knight expressed confusion about why Whorton only wired $314,000, and Barber responded that Whorton informed Barber "he only had that much today and work [with] him." It is unclear why Barber did not disclose Whorton's efforts to negotiate down the payment. Knight testified that Barber claimed that Whorton and Combs had reneged on the payments and that Whorton had loaned Barber $314,000.

Around the time that Whorton wired the Executive Plaza funds into Knight's IOLTA, Barber was working to organize another real estate deal involving Whorton, Epsilon, and Barber. The anticipated deal required Epsilon to borrow money, and Barber decided to infuse capital into Epsilon to make the company a more credit-worthy borrower. On November 10, 2008, Knight transferred $150,000 from his IOLTA into an Epsilon business account. Despite the capital infusion, Epsilon was unable to obtain financing, and the anticipated deal fell through. The disposition of the $150,000 is a major point of contention in this appeal. Van Doren testified that even after the $150,000 was transferred into Epsilon's business account, the money still belonged to Barber and that Barber transferred the money to him for the purpose of hiding it from creditors. Van Doren further testified that Knight asked him to falsely document the transfer as a payment or loan to Epsilon. However, the record also indicates that Van Doren, at the advice of his own attorney, documented the transfer as payment for an antecedent debt that Barber or one of his entities owed to Epsilon. Van Doren ultimately kept $123,000, and in March 2009 he transferred the remaining $27,000 to an account held by NWARE (the "NWARE Account").

Between November 2008 and January 21, 2009, Knight disbursed all the remaining funds in his IOLTA. On November 6, 2008, Knight paid a $7,500 gambling debt Barber incurred. Knight also used $10,000 of IOLTA funds to pay legal fees Barber owed to him. The remaining funds were disbursed either to the Barber Group or to the NWARE Account. Three of Knight's transfers to the NWARE Account exceeded $10,000–these transfers are the subject of the money laundering charges in Counts 6, 7 and 8 of the Indictment. There is no evidence that Barber placed any funds into Knight's IOLTA after January 21, 2009.

## 2. Legacy Bank Discovery Requests

On November 26, 2008, Legacy Bank obtained an $8.4 million deficiency judgment against Lynnkohn, Barber and others on the Legacy Bank foreclosure action. On December 29, 2008, Legacy Bank filed detailed interrogatories designed to locate any of Barber's assets that could be used to satisfy the bank's deficiency judgment. These interrogatories asked Barber to identify, inter alia, all accounts which he controlled and/or into which he made deposits and any business entities that he owned. On January 19, 2009, the date Barber's responses were due, Barber still had roughly $7,500 in Knight's IOLTA. However, by February 23, 2009, the date on which Knight filed responses on Barber's behalf, the IOLTA funds had been exhausted. Barber did disclose NWARE and the NWARE Account. He did not, however, disclose EIA or his use of Knight's IOLTA.

## B. Barber Files for Bankruptcy

On July 31, 2009, Barber, with Knight acting as his attorney, filed a petition for Chapter 7 bankruptcy. Barber and Knight had previously executed an employment agreement in which Knight, in exchange for $20,000, agreed to assist Barber in preparing his bankruptcy petition and schedules and to attend the first meeting of creditors. The agreement further specified that, if Barber desired Knight

to assist him with other matters, including adversarial proceedings, Barber would pay Knight and/or Knight's associates their current hourly rate.

Barber initially filed a skeleton petition but supplemented his bankruptcy filings several times. One of these supplements merits some discussion. On September 11, 2009, Barber supplemented his petition by filing his SOFA and several partially completed schedules (the "September 2009 Supplement"). The record indicates that Bennett and two of Knight's associates, Mason Wann and Lauren Pritchard, performed most of the work in preparing the September 2009 Supplement. Email communications between Bennett and Wann indicate that Wann was aware that Barber used funds from the NWARE Account to pay for personal expenses, and he explicitly advised Barber to list such payments as income to him. Bennett also provided Wann with a list of roughly 20 entities that Barber owned; NWARE was included in this list but EIA was not included. Barber signed the schedules and the SOFA under penalty of perjury that the information contained therein was true and correct. Knight did not sign these documents but did sign a certification that disclosed his compensation for services rendered or to be rendered in relation to the bankruptcy proceeding, including analyzing Barber's "financial situation" and preparing and filing "any petition, schedules, and statement of affairs [that] may be required."

The government contends that the September 2009 Supplement severely misrepresented Barber's income and omitted numerous material facts that Barber was required to disclose. Most of the alleged misrepresentations and omissions involve Barber's SOFA. With respect to Barber's income disclosure, the SOFA required Barber to list his gross income for the current year-to-date and the two prior years. Barber's SOFA represented that his income for 2008 was slightly over $4,000 (including $2,712 in income from the Barber Group and $714 from NWARE) and that his year-to-date income for 2009 was $1,429 (wages from NWARE). Barber did not list any income earned by entities that he owned. The SOFA also required Barber

to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred [absolutely] within two years immediately preceding the commencement of this case." Although Barber listed multiple relevant transfers, he did not disclose any of the transfers he and Knight made into or out of the IOLTA. Barber also included with his schedules a list of entities that he owned. NWARE was disclosed, but EIA was not disclosed in this list. Barber did not disclose the NWARE Account or the IOLTA. Barber also did not disclose any of the legal fees he paid to Knight.

John Lee was appointed as the trustee in Barber's bankruptcy case. After reviewing the September 2009 Supplement, Lee sent Knight a letter expressing some rather strongly-worded concerns Lee had with the supplement, particularly Barber's income disclosures and his representation that NWARE was not worth anything. The next day, Knight contacted Barber and asked him to gather several items for Lee, including the three most recent bank statements for the NWARE Account. Unbeknownst to Knight, Barber instructed Bennett not to give Knight the August 2009 statement for the NWARE Account because "[we] don't want to show the cashier's checks, etc." Bennett subsequently gave Knight several statements for the NWARE Account but did not provide him with the August 2009 statement. Knight gave these statements to Lee. In late October 2009, Barber filed an amendment to his SOFA that disclosed an additional $2,083 of monthly income that he received from operation of a business. Barber later filed additional supplements but apparently never amended his income figures, disclosed EIA on his entity list, or included any information about the NWARE Account or the IOLTA.

-13-

## C.    Adversary Proceeding

### 1.    Van Doren's Deposition

On February 19, 2010, Legacy Bank filed an adversary proceeding (AP) against Barber in bankruptcy court, objecting to the discharge of Barber's debts on the grounds that he had not made truthful disclosures in his bankruptcy filings. Knight's representation of Barber had previously ended after the first meeting of creditors, and Barber decided to represent himself during the AP. On July 23, 2010, Marshall Ney, Legacy Bank's attorney, deposed Van Doren in relation to the AP. Ney apparently had a copy of the settlement statement for the Ballpark Transaction, and he asked Van Doren about a notation in the statement regarding a $688,937 payoff to Epsilon held in care of the Knight Law Firm. Van Doren told Ney that Epsilon received only a small portion of the Ballpark proceeds and that he did not know what happened to the remainder of the funds. Van Doren did not mention the Escrow Agreement. In addition, Barber had previously provided Ney with a copy of the Escrow Agreement, but Ney apparently had not reviewed this document before he took Van Doren's deposition. During the deposition Van Doren also discussed two transfers Barber made to him. Van Doren claimed that in September 2008 Barber had endorsed a $64,000 check over to Van Doren, who deposited these funds into his personal Citibank account and later disbursed the money back to Barber or the Barber group.[8] Van Doren also claimed that in October 2008 Barber showed up at his office with a briefcase that contained $30,000 in cash and asked Van Doren to hold onto this money for him so that Barber's wife and/or his creditors would not know that he had

---

[8]Van Doren was indicted along with Barber and Knight and Van Doren ultimately pled guilty to one count of money laundering based on a $22,000 transfer he made to the Barber Group. After Knight's trial, Van Doren moved to withdraw his guilty plea, but the district court denied his motion. Van Doren has appealed the district court's denial of his motion to withdraw his plea and also has appealed his sentence.

the money. Van Doren placed the briefcase in a safe deposit box, but at Knight's trial Van Doren testified that this money still belonged to Barber. Van Doren did not, however, testify about the $150,000 transfer Epsilon received from Knight's IOLTA. Barber, still proceeding pro se, did not attend Van Doren's deposition, and there was no cross-examination.

On August 12, 2010–one week before the AP was set to go to trial–Knight agreed to represent Barber pro bono in the AP and entered an appearance on Barber's behalf. Knight claims that he agreed to represent Barber pro bono because he believed that Ney was treating Barber poorly. The record indicates that Knight asked Ney if he would agree to a continuance. Ney responded that he would not agree to a continuance and further indicated that if the AP trial were delayed, he would depose Knight and subpoena the bank records of Knight's firm to answer some questions related to "the flow of money to and from [Knight's] firm." For whatever reason, Knight ultimately decided not to seek a continuance, and Ney did not subpoena any records from Knight.

During his eleventh-hour preparations to represent Barber in the AP trial, Knight read Van Doren's deposition and, by all appearances, learned for the first time about the $64,000 and $30,000 transfers Barber made to Van Doren. Knight subsequently sent Barber an email in which he noted that Van Doren "sings like a canary," and Knight informed Barber that the $64,000 transfer "may cause you some trouble." Barber responded that he "completely forgot about" the transfer and claimed that he gave Van Doren these funds because he did not have a checking account at that time. The record indicates that Knight took several steps to determine whether Barber needed to amend his petition to disclose the transfers to Van Doren, including consulting with University of Arkansas Professor of Law Tim Tarvin about whether the $64,000 was a fraudulent transfer intended to hinder or delay Barber's creditors. Tarvin recommended that Knight amend the petition and allow Barber to explain why he did not disclose the transfers. Knight, however, apparently further

-15-

researched the circumstances surrounding the transfers and decided that Barber did not need to disclose either of them.

## 2. Barber's Discharge Denied

The AP trial began on August 19, 2010, and lasted approximately a day and a half. Barber testified on the first day of the trial and apparently claimed that he transferred the $64,000 to Van Doren because he did not have a bank account at the time. Ney, however, presented evidence that at the time of the transfer Barber had at least three bank accounts open in his name. That same evening, Knight sent an email to Wann in which he complained that Barber "told us a long time ago that those accounts were closed" and further indicated that he expected the bankruptcy judge to deny Barber a discharge. On November 9, 2010, the bankruptcy judge entered an order denying Barber a discharge for several reasons, including that within one year of filing his bankruptcy petition Barber had, with intent to hinder, delay, or defraud his creditors, concealed his money by transferring it through Van Doren or into the NWARE Account.[9] See 11 U.S.C. § 727(a)(2)(A). The bankruptcy judge also concluded that Barber had fraudulently omitted material information from his bankruptcy filings, including roughly $112,000 in loans he had received, and further noted the record was replete with information that placed in question the accuracy of Barber's filings, including "[t]he unexplained location of approximately $588,000 [sic] that was transferred to the Knight Law Firm."

After the bankruptcy judge denied Barber a discharge, Lee emailed Knight to ask about what happened to the $688,000. After some additional prodding by Lee, Knight composed a letter that accurately described the Ballpark Transaction and

---

[9]The bankruptcy judge's order also noted that the records for the NWARE Account indicated that numerous individuals in addition to Van Doren had transferred money into the account. The bankruptcy judge apparently took no issue, however, with the transfers from Knight's IOLTA into the NWARE Account.

disclosed the Escrow Agreement between EIA and Epsilon. Knight also provided Lee with various documents related to the Ballpark Transaction and his IOLTA records. Lee examined these documents but apparently found them hard to follow. Lee ultimately decided not to pursue any of the Escrowed Funds that passed through the IOLTA because he believed he had little chance of recovering them. Lee subsequently made a criminal referral regarding Barber, but not Knight, to the United States Trustee for Arkansas. Ney made a similar referral regarding Barber to the Federal Bureau of Investigation and the Internal Revenue Service. The Arkansas Office of Professional Responsibility also briefly investigated Knight's use of his IOLTA but decided not to pursue the matter.

### D. Knight's Trial

On January 16, 2013, a federal grand jury sitting in the Western District of Arkansas issued an indictment charging Barber, Knight and Van Doren with various offenses. Both Barber and Van Doren entered guilty pleas before the scheduled trial date. On October 30, 2013, Knight was indicted in a fourth superseding indictment (the "Indictment") with conspiracy to commit bankruptcy fraud, aiding and abetting bankruptcy fraud, aiding and abetting the making of a false statement in relation to a bankruptcy proceeding, and five counts of aiding and abetting money laundering. Knight's trial began on November 4, 2013.

### 1. Testimony Regarding Knight's Use of the IOLTA

At Knight's trial, both Knight and the government provided expert testimony regarding the propriety of Knight's use of his IOLTA on Barber's behalf. Attorney John Everett testified as an expert for Knight, and attorney Rex Terry testified as an expert for the government. Everett testified that Knight's use of his IOLTA was appropriate and in full accord with the Arkansas Rules of Professional Conduct, particularly since attorneys can accept client funds into an IOLTA even though the

client has outstanding judgments against him or her. Everett further claimed that creditors can garnish debtor funds that are stored in an IOLTA, and he opined that an IOLTA would be a very poor place to try to hide money. Terry, on the other hand, testified that Knight's use of his IOLTA was "egregious" and that it would be possible to conceal money in an IOLTA. Terry could not, however, point to any particular rule of professional conduct that Knight violated, and he indicated that Knight's use of his IOLTA was probably not illegal unless Knight acted with intent to defraud Barber's creditors. The testimony of Everett, Terry and other witnesses further clarified that client funds held in an attorney's IOLTA belong to the client and that the attorney can disburse these funds only at the client's direction.

## 2. Testimony Regarding Barber's Bankruptcy Disclosures

Both parties also provided expert testimony regarding the types of disclosures Barber was required to make in his bankruptcy filings and the duties a bankruptcy attorney has with respect to his or her client's filings. David Nixon, Knight's bankruptcy expert on these matters, testified that an attorney's signature on documents filed by a bankruptcy client certifies a number of things, including that any legal claims or contentions in the document are non-frivolous and that any factual contentions have or are likely to have evidentiary support. With respect to Barber's income disclosures, Nixon testified that Barber was only required to list his gross income and that he did not have to disclose income earned by entities that he owned or any transfers related to such income. Nixon did acknowledge that entity income that actually belonged to or was disbursed for the personal benefit of the debtor probably must be disclosed. However, Nixon also testified that a bankruptcy attorney is entitled to rely on a client's representations regarding whether income belongs to the client or the client's entity unless the attorney knows the entity has no business purpose or, in certain circumstances, knows the client is using entity funds to pay for personal expenses. Finally, Nixon indicated that, even if the money that passed through Knight's IOLTA belonged to Barber personally, as opposed to one of his

-18-

entities, few, and perhaps none, of the transfers out of the IOLTA needed to be reported because they arguably were within the ordinary course of Barber's business or financial affairs, including Knight's payment of Barber's gambling debts.

Jill Jacoway, who provided expert testimony for the government, disagreed with many of Nixon's conclusions. Specifically, Jacoway testified that Barber was legally required to disclose all of the transfers into and out of Knight's IOLTA (105 total transfers). However, on cross-examination Jacoway admitted that she knew nothing about the context in which any of the transfers were made, nor does it appear that she had any knowledge about Barber's ordinary business or financial affairs. Jacoway also testified that Barber should have disclosed income earned by his entities. However, on cross-examination Jacoway admitted that the law was murky regarding whether debtors had to disclose entity income and that Knight could have reasonably concluded that Barber did not have to do so. In sum, Jacoway's testimony consisted largely of her providing insightful thoughts regarding what information she would have provided on Barber's petition and schedules; however, it is very questionable whether she offered sufficient factual or legal support for why Barber was required to disclose the transfers into or out of Knight's IOLTA.

After a mere six hours of deliberation, the jury convicted Knight on all counts charged. Knight subsequently filed a motion for judgment of acquittal or a new trial on all counts. The district court denied Knight's motion for judgment of acquittal on the conspiracy, bankruptcy fraud and money laundering counts after concluding the government had, by a slim margin, offered sufficient evidence to prove that Knight had knowingly allowed Barber to pass funds through his IOLTA for the purpose of concealing these funds during Barber's bankruptcy proceeding. However, the district court granted Knight a new trial on these counts after concluding the evidence heavily preponderated against the jury's verdict and that a miscarriage of justice would occur if Knight did not receive a new trial. The district court also granted Knight's motion for judgment of acquittal on the false statement charge and additionally granted

Knight a new trial on this count in the event this court reversed. The government appeals.

## II.   DISCUSSION

### A.   New Trial

On appeal, the government contends the district court erred in granting Knight a new trial on the conspiracy, bankruptcy fraud and money laundering counts. Rule 33(a) of the Federal Rules of Criminal Procedure permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The decision to grant or deny a motion for a new trial based upon the weight of the evidence is within the sound discretion of the trial court." United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). In so deciding, the trial court "can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." Id. (quotation omitted). "Motions for new trials based on the weight of the evidence are generally disfavored." Id. Trial courts should "exercise the Rule 33 authority sparingly and with caution." Id. (internal quotation omitted). The remedy "is reserved for exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Johnson, 474 F.3d 1044, 1051 (8th Cir. 2007) (internal quotation omitted). "A district court may grant a new trial for insufficiency of the evidence only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." United States v. Vore, 743 F.3d 1175, 1181 (8th Cir. 2014). We review the district court's decision to grant a new trial for abuse of discretion. Campos, 306 F.3d at 579. "An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing the factors commits a clear error of judgment." Id. at 580 (quotation omitted).

### 1. Conspiracy to Commit Bankruptcy Fraud

With respect to the conspiracy count, the government charged Knight under 18 U.S.C. § 157. One commits bankruptcy fraud under § 157 by (1) devising a scheme to defraud, and (2) filing a document in a bankruptcy proceeding or making false or fraudulent statement in relation to the bankruptcy proceeding for the purpose of executing or concealing the fraudulent scheme. 18 U.S.C. § 157; United States v. White, 737 F.3d 1121, 1131 (7th Cir. 2013), cert. denied, 134 S. Ct. 2717 (2014). "To obtain a conviction for conspiracy, the government must prove beyond a reasonable doubt that there was an agreement to achieve some illegal purpose [i.e., § 157 bankruptcy fraud], that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy. United States v. Adams, 401 F.3d 886, 893 (8th Cir. 2005) (quotation omitted).

We begin our analysis by noting the government has not clearly articulated the underlying fraudulent scheme that Barber and Knight supposedly agreed to conceal during Barber's bankruptcy proceeding. The government contends, and we agree, that the jury could have reasonably concluded that at least some of the money that passed through the IOLTA belonged to Barber and that Knight and Barber used the IOLTA to impede creditors from learning about and pursuing these funds. What the government has not clearly explained, however, is why Barber's and Knight's conduct was *fraudulent* as to Barber's creditors. The government certainly does not claim that debtors generally must keep creditors apprised of where their assets are located, particularly before the creditor has obtained a judgment against the debtor or utilized lawful means to locate and execute upon the debtor's assets.[10] Cf. In re Addison, 540

---

[10]Everett testified that, in his opinion, Knight did not have an obligation to inform Barber's creditors that Barber had funds in Knight's IOLTA unless and until Knight was served with a writ of garnishment or had some other legal obligation to

F.3d 805, 814 (8th Cir. 2008) ("[I]t is well established that [absent additional indicia of fraud] a debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy for the express purpose of placing that property beyond the reach of creditors . . . will not deprive the debtor of the exemption to which he otherwise would be entitled." (quotation omitted)). Nor does the government contend that Barber and Knight concealed Barber's assets when he was negotiating debt settlements with his creditors. See Pasquantino v. United States, 544 U.S. 349, 356 (2005) (suggesting that such conduct might constitute common-law fraud).

Instead, the Indictment and the jury instructions indicate the government charged Knight on a theory that he knowingly allowed Barber to transfer money through the IOLTA in order to buy time so that Barber could spend the money before filing for bankruptcy.[11] The government further alleges that Barber, with Knight's assistance, concealed his efforts to hinder or delay his creditors by making false or fraudulent statements in his bankruptcy filings. See 11 U.S.C. § 727(a)(2)(stating the court may deny a discharge if "the debtor, with intent to hinder, delay, or defraud a creditor . . . [has transferred or concealed] property of the debtor, within one year before the date of the filing of the petition").

Having closely reviewed the record, we cannot say the district court abused its discretion in concluding the evidence heavily preponderated against a finding that Knight conspired with Barber to commit bankruptcy fraud. As discussed in more

disclose the funds.

[11]We interpret the rather vague language of the Indictment in this manner primarily because the government points us to no evidence suggesting that Knight knew or believed that Barber had any assets left at the time he filed for bankruptcy. Although there is evidence that Barber omitted certain reportable assets from his bankruptcy filings, the record strongly suggests he took affirmative steps to prevent Knight from discovering these omissions.

detail below, the government has offered little direct or circumstantial evidence that Knight's use of his IOLTA was motivated by an intent to defraud Barber's creditors in bankruptcy or that Knight knowingly assisted Barber in making any false or fraudulent statements in his bankruptcy filings. Accordingly, we affirm the district court's decision to grant Knight a new trial on the conspiracy count.

## 2. Bankruptcy Fraud

As noted above, the Indictment additionally charged Knight with aiding and abetting Barber in committing bankruptcy fraud–concealment of assets under 18 U.S.C. § 152(7). "There are three essential elements of aiding and abetting: (1) the defendant associated [him]self with the unlawful venture; (2) the defendant participated in it as something [he] wished to bring about; and (3) the defendant sought by his actions to make it succeed." United States v. Mitchell, 388 F.3d 1139, 1143-44 (8th Cir. 2004). To sustain a conviction under § 152(7), the government must prove the defendant, in contemplation of bankruptcy or with intent to defeat the provisions of title 11, "knowingly and fraudulently" transferred or concealed his property. 18 U.S.C. § 152(7). The Indictment further specified that the government charged Knight with knowingly aiding and abetting Barber in transferring funds into the IOLTA for the purpose of fraudulently concealing this money during Barber's future bankruptcy proceeding.[12]

_____

[12]The parties exert substantial effort arguing about whether the district court correctly concluded that, in the context of § 152(7), the phrase "in contemplation of bankruptcy" means the contemplation of Barber's bankruptcy was "the impelling cause in Knight transferring Barber's money through his" IOLTA. Although the district court likely interpreted the phrase correctly, see Milavetz, Gallop & Milavetz v. United States, 559 U.S. 229, 240 (2010); Conrad, Rubin & Lesser v. Pender, 289 U.S. 472, 476-77 (1933), we need not decide this issue.

In analyzing Knight's motion for a new trial, the district court provided an extraordinarily thorough discussion of the parties' evidence and whether such evidence weighed for or against the jury's verdict. The government points us to no relevant evidence that the district court did not address, either directly or implicitly. Nor does it appear that the district court gave significant weight to an irrelevant factor. Accordingly, our analysis must focus on whether, in weighing the evidence it considered, the district court committed a clear error in judgment. Campos, 306 F.3d at 579.

In denying Knight's motion for judgment of acquittal on the bankruptcy and conspiracy counts, the district court noted there was some circumstantial evidence that Knight knowingly helped Barber hide income and assets during the bankruptcy proceeding. Specifically, the district court noted there was evidence that Knight and Barber used the IOLTA to impede Barber's creditors from knowing that he had money available, that NWARE was formed for the purpose of holding Barber's money and keeping his creditors in the dark about his business activities, and that Barber omitted from his bankruptcy filings virtually any information that would have revealed his use of Knight's IOLTA. The district court concluded that this circumstantial evidence, although thin, did support an inference that Barber and Knight used the IOLTA to conceal Barber's (now exhausted) funds from his creditors and the bankruptcy court.

In analyzing Knight's motion for a new trial, however, the district court noted that most of the evidence in the record weighed in favor of Knight's innocence or was inconclusive. With respect to the three real estate deals that netted Barber and/or his entities money in 2008, the district court held there was no persuasive evidence that Knight played a meaningful role in these deals or that he advised or helped Barber

-24-

structure[13] the transactions so that the proceeds could be hidden in bankruptcy. The district court further concluded, based on testimony by both parties' experts, that under the circumstances, Knight's use of his IOLTA, although arguably unethical, was not illegal absent additional evidence that Knight knowingly helped Barber hide money during his bankruptcy proceeding. With respect to Knight's role in forming NWARE, the district court held this evidence provided, at best, weak proof that Knight intended to defraud Barber's bankruptcy creditors, particularly since during the bankruptcy proceeding Knight and/or his associates encouraged Barber to disclose NWARE and any payments from the company that were made to Barber for his personal benefit. The district court also identified that a substantial majority of the money that passed through Knight's IOLTA was disbursed either to Barber's business entities or to pay the debts of those entities. Finally, the district court noted that, although Knight and Barber discussed the possibility of bankruptcy in early 2008, there was evidence that Barber regularly claimed that he was going to avoid bankruptcy by working his way out of debt and that Barber did not affirmatively decide to file for bankruptcy until July 2009. Viewing the totality of the circumstances surrounding Barber's and Knight's pre-bankruptcy activities, the district court concluded that this evidence tended to show that Knight used his

---

[13]The district court noted that a number of witnesses, including Van Doren, made rather conclusive statements that Knight was heavily involved in some or all of the three transactions. The court further identified, however, that on cross-examination each of these witnesses admitted that they had no personal knowledge of Knight's involvement and that they believed Knight must have been involved because he handled most of Barber's legal matters. Based on this testimony and the relatively short time that the jury deliberated, the district court expressed grave concern that the jury convicted Knight because he was Barber's attorney and not based on any competent evidence that Knight actually knew about, or was involved in, Barber's illegal conduct.

IOLTA to help Barber stay in business and avoid bankruptcy, as opposed to using the account to defraud Barber's bankruptcy creditors.

The district court also extensively discussed evidence related to the role Knight played in preparing Barber's bankruptcy filings and whether Knight knew of any false or fraudulent statements in Barber's filings. The district court first identified that Knight's associates performed most of the work on Barber's filings and that there was no evidence that Knight influenced what information they included in the filings. The district court further noted that at various points in Barber's bankruptcy proceedings, Knight and/or his associates encouraged Barber to "disclose everything," including any payments from NWARE to Barber or on his behalf, and that the various disclosures in Barber's bankruptcy filings apparently were consistent with the information Barber provided to Knight and his associates.

Finally, the district court placed substantial emphasis on the complex factual circumstances and murky law surrounding the disclosures Barber made in his bankruptcy filings. With respect to the transfers through Knight's IOLTA, the district court noted the parties offered conflicting expert testimony regarding whether Barber was legally required to report any of these transfers. As noted above, Jacoway testified that all of the transfers should have been disclosed. The district court, however, gave little weight to her testimony, apparently because she had not given any consideration to whether the transfers through Knight's IOLTA involved entity income or were transfers made in the ordinary course of Barber's business or financial affairs. The district court instead determined that Knight could have reasonably concluded that most, if not all, of the transfers through the IOLTA, including Barber's $64,000, $30,000 and $150,000 transfers to Van Doren or Epsilon, involved entity income, were made in the ordinary course of Barber's business as a real estate developer, were made in the ordinary course of Barber's financial affairs or were not absolute transfers. With respect to Barber's failure to disclose EIA, the district court

-26-

acknowledged that this entity should have been included on Barber's entity list. However, the district court noted that the government had not explained what Knight or Barber could have gained by failing to list EIA, particularly since EIA had no value and Barber disclosed other entities to which Knight disbursed funds from the IOLTA (i.e., NWARE and the Barber Group). In addition, the district court noted that during the AP, Barber gave Legacy Bank a copy of the Escrow Agreement, which suggests he was not trying to hide the fact that he and/or his entities had deposited funds into the IOLTA. Finally, the district court held that Knight could have reasonably concluded that Barber's income disclosures were accurate and that the funds that passed through the IOLTA, including the funds used to pay Knight's legal fees, belonged to Barber's entities or were loan proceeds.

The district court thus determined that, given the complex legal issues and factual circumstances surrounding Barber's financial dealings and his bankruptcy filings, as well as Knight's relative inexperience as a bankruptcy attorney, the disclosures contained in Barber's filings shed little light on Knight's state of mind at the time he allowed Barber to transfers funds into his IOLTA. Ultimately, the district court concluded that the government's evidence "largely invited only speculation and conjecture," and was fraught with gaps that "were too large to be reasonably filled by inference without leaving some doubt as to the correctness of the verdict." The district court further expressed concern that, given the short amount of time that the jury deliberated, the jury had not adequately weighed the dense factual and legal issues in the case and had instead convicted Knight because he was Barber's lawyer.

On appeal, the government contends the district court mis-weighed certain evidence that preponderated in favor of the jury's verdict. Of particular relevance, the government argues that the district court gave too little weight to: (1) evidence that Knight and Barber used the IOLTA to keep Barber's creditors from learning that he had money available; (2) evidence that NWARE was a sham entity that was used to

divert money to Barber's own pocket; (3) Barber's transfers to Van Doren, including evidence that Knight asked Van Doren to "falsely" document the $150,000 transfer to Epsilon as a loan or payment; (4) Barber's failure to disclose EIA in his bankruptcy filings; and (5) evidence that Barber should have disclosed all of the transfers through the IOLTA. The government also contends the district court gave too much weight to the short amount of time that the jury deliberated.

We find no fault in the district court's conclusions regarding Knight's use of his IOLTA on Barber's behalf or the reasons underlying Knight and Barber's formation of NWARE. The record indicates that Barber could have filed for bankruptcy in early 2008, and there is no evidence that he temporarily put off bankruptcy so that he could liquidate and exhaust or hide the assets he owned at that time. This lends substantial credibility to the explanation that Knight attributed to Barber's money-producing activities in 2008–Barber was trying to work his way out of debt and avoid bankruptcy.

Likewise, we find no merit in the government's contention that the district court mis-weighed evidence related to the transfers Barber and Knight made to Van Doren and Epsilon. With respect to Barber's $64,000 and $30,000 transfers to Van Doren, there is no evidence that Knight knew about these transfers until the eve of the AP. These transfers therefore shed no light on Knight's state of mind at the time he accepted money into his IOLTA on behalf of Barber or Barber's entities. Further, we are wholly unpersuaded that Knight's failure to amend Barber's bankruptcy filings to include these transfers suggests intent by Knight to conceal Barber's pre-bankruptcy activities from his creditors. Legacy Bank was aware of Barber's two transfers to Van Doren, and Knight surely knew that the bank's counsel would bring the transfers up during the AP. In addition, Knight, by all appearances, made a good faith effort to determine whether Barber was required to disclose these transfers. Accordingly, we find no clear error in the district court's holding that Knight's failure to disclose these

transfers was not indicative of an intent to conceal assets or material information from Barber's creditors. The same is true for Knight's failure to disclose the $150,000 transfer from his IOLTA to Epsilon. Although Van Doren claimed the purpose of this transfer was to hide the money from Barber's creditors so that he could use it for personal expenses, the district court quite reasonably gave little weight to Van Doren's contradictory and self-serving testimony. In addition, the record indicates that Van Doren documented and treated this transfer as payment for an antecedent debt that Barber or one of his entities owed to Epsilon, which was fully in line with how Knight supposedly asked Van Doren to document the transfer. Accordingly, the district court did not commit a clear error in judgment by granting little weight to Van Doren's claim that the purpose of the $150,000 transfer was to hide this money from Barber's creditors.

We further find no fault in the district court's decision to grant little weight to Jacoway's testimony that Barber should have disclosed all of the transfers into and out of Knight's IOLTA. With respect to the transfers into Knight's IOLTA, Jacoway provided no rebuttal to Nixon's or Lee's testimony that, because Barber owned and controlled funds in the IOLTA, his transfers into the account were not "absolute" and Barber therefore did not have to list them as absolute transfers. Indeed, Jacoway did not specify where Barber should have listed the transfers into Knight's IOLTA and instead vaguely suggested that, because these transfers were unusual, they should have been reported "somewhere." With respect to the transfers out of the IOLTA, Jacoway's opinion clearly was based on the unfounded assumption that all of the money that passed through Knight's IOLTA conclusively belonged to Barber personally, as opposed to one of his entities. Jacoway also analyzed the transfers in a vacuum, with little context, and could not offer reasoned opinions regarding whether any or all of the transfers occurred in the ordinary course of Barber's business or financial affairs. In light of these rather significant gaps in Jacoway's knowledge, the district court quite reasonably concluded that Jacoway's "black-and-white analysis

of the transfers . . . inherently leaves room for doubt as to the absolute validity of the opinion."  Thus, although district courts ordinarily should leave credibility determinations to the jury, United States v. McAtee, 481 F.3d 1099, 1104-05 (8th Cir. 2007), in this instance Jacoway's conclusions were largely devoid of legal or factual support, and we cannot say the district court committed a clear error in judgment by granting little weight to her conclusions.

We, like the district court, also see little significance in Barber's failure to disclose EIA on the entity list contained in his bankruptcy filing.  The government takes issue with Knight's testimony that he inadvertently left EIA off Barber's entity list and that he also did not list the proceeds from the Ballpark Transaction as income to Barber because this money belonged to EIA.  According to the government, Knight's testimony makes little sense because "either EIA was on Knight's mind when he prepared the schedules or it was not."  However, although EIA played a role in the Ballpark and Spring Creek transactions, we fail to see what Knight and Barber would have expected to gain by intentionally failing to disclose this entity.  There is no evidence that Barber was hiding money in EIA or that the entity was worth anything.  Further, it seems unlikely that Barber's omission of EIA was part of a calculated effort to conceal his use of Knight's IOLTA, particularly since Barber disclosed other entities that received transfers from the IOLTA.  In addition, during the AP Barber provided Legacy Bank with a copy of the Escrow Agreement that explicitly disclosed EIA's existence and the benefits that EIA received from the Ballpark Transaction.  Accordingly, we agree that Barber's failure to disclose EIA has little bearing on the issue of whether he and Knight transferred funds into and through the IOLTA for the purpose of concealing this money during Barber's bankruptcy proceeding.

In sum, we cannot say that the district court committed a clear error in judgment in weighing the extraordinarily complex evidence presented in this matter. Campos, 306 F.3d at 580.  The government's evidence that Knight knowingly allowed

-30-

Barber to transfer money into the IOLTA for the purpose of concealing these funds during Barber's bankruptcy proceeding was highly circumstantial, tenuously connected, and "largely invited only speculation and conjecture." The district court was quite thorough in its efforts to identify and weigh the government's evidence of Knight's guilt, and its findings of fact and conclusions of law were reasonable and amply supported by the record. Accordingly, we hold the district court carefully and appropriately exercised its Rule 33 authority, and we affirm its decision to grant Knight a new trial on the bankruptcy fraud count.[14]

## B.     False Statement Count

### 1.     Judgment of Acquittal

The government next contends the district court erred by granting Knight's motion for judgment of acquittal on the false statement count. This charge arose under 18 U.S.C. § 152(3), which provides that "[a] person who knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury . . . in or in relation to any case under title 11" is guilty of making a false oath or statement. 18 U.S.C. § 152(3).

Although Barber's bankruptcy filings allegedly contained several false statements, the Indictment clarifies that the false statement count against Knight is

---

[14]Each of the money laundering counts in the Indictment charged Knight with knowingly engaging in a monetary transaction involving funds that were derived from § 152(7) bankruptcy fraud. Because we agree with the district court that the evidence heavily preponderates against a finding that Knight's use of his IOLTA constituted bankruptcy fraud, we also affirm the district court's decision to grant Knight a new trial on the money laundering counts.

based solely on Barber's alleged failure to disclose on his SOFA over $1 million of income that he received in 2008. Although the government seemingly concedes that only Barber signed the SOFA under oath, it nonetheless contends the evidence was sufficient to support a finding that Knight aided and abetted Barber's allegedly false disclosure about his income. 18 U.S.C. § 2(a). We review "questions as to the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Young, 753 F.3d 757, 782-83 (8th Cir. 2014) (internal quotation omitted), cert. denied, 135 S. Ct. 986 (2015). The verdict should be overturned only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. Id. at 783.

The district court cited several reasons for granting Knight's motion for judgment of acquittal on the false statement count. The district court first determined there was insufficient evidence that Knight independently influenced Barber's income disclosures or committed any other affirmative act in furtherance of Barber's false income disclosure. In support of this conclusion, the district court noted that Knight advised Barber that he "would rather have too much" income disclosed than not enough and that none of the parties involved in the bankruptcy proceeding made a criminal referral regarding Knight. The district court also, for reasons that are not entirely clear, believed that the government's case as to the false statement count "relied on the fact that Barber's income was under-reported as a result of not including income to his entities." The district court further noted that both parties' experts agreed that "there was a reasonable basis in the law for not reporting entity income as personal income on the SOFA." The court thus held that the government had failed to prove that Barber made a false statement related to his income on the SOFA.

-32-

Having closely reviewed the record, we hold the district court erred in granting Knight's motion for judgment of acquittal on the false statement charge. Contrary to the district court's framing of the legal theory, the government directly attempted to prove that Barber personally received income for his role in the Spring Creek and Executive Plaza transactions, not that Barber fraudulently under-reported *entity income*. Granting the government the benefit of all reasonable inferences, and viewing the evidence in the light most favorable to it, the government offered sufficient circumstantial evidence to prove that Knight knew that Barber received $314,000 of personal income from the Executive Plaza Transaction. See id. at 782-83. Although Knight testified that he believed this money was a loan and provided circumstantial evidence in support of this claim, the jury could have disbelieved Knight's testimony, and his circumstantial evidence was not overwhelming enough to compel a finding that he believed the $314,000 was a loan. See United States v. Reed, 297 F.3d 787, 789 (8th Cir. 2002) ("[W]hen there is other corroborative evidence of guilt, the jury can properly draw an inference of guilt from its disbelief of the defendant's denials.") (quotation omitted). Accordingly, the district court's grant of judgment of acquittal on the false statement count must be reversed.

### 2. New Trial

The government next contends the district court erred by conditionally granting Knight a new trial on the false statement count. The district court cited two justifications in support of its decision to grant a new trial on this count. The district court first concluded that its false statement instruction to the jury was so defective that by giving the instruction the court committed plain error that affected Knight's substantial rights.[15] The district court alternatively held that Knight was entitled to a new trial on this count based on the weight of the evidence. We review the district

---

[15]Knight did not object to the jury instruction at issue.

court's decision to grant a new trial for an abuse of discretion. Campos, 306 F.3d at 579.

Having closely reviewed the record, we agree that Knight is entitled to a new trial on the grounds that the false statement instruction was defective. The instruction stated that the jury could convict Knight if he knowingly and fraudulently "made a material false statement in relation to the bankruptcy proceeding." The Indictment, however, charged Knight with making a specific false statement regarding Barber's income for 2008. At trial, the government offered evidence of numerous additional false statements that Barber, with Knight's knowing assistance, allegedly made in relation to the bankruptcy proceeding. In granting Knight's motion for a new trial, the district court expressed concern that the jury convicted Knight based on uncharged false statements that were included in Barber's bankruptcy filings. The district court's reasoning is sound, and we affirm its decision to grant Knight a new trial on the basis of a defective jury instruction. We therefore need not address the district court's alternative grounds for granting Knight a new trial on the false statement count.[16]

## III.   CONCLUSION

For the reasons stated herein, we reverse the district court's grant of Knight's motion for judgment of acquittal on the false statement charge and affirm the district court's decision to grant Knight a new trial on all counts.

---

[16]We note, however, that the evidence preponderated, perhaps heavily so, towards a finding that Knight believed that the proceeds derived from the three real estate transactions constituted entity income or loans to Barber and that Barber therefore was not required to report these proceeds as his personal income.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

From reading the district court's 102-page opinion granting Kenneth Vaughn Knight a new trial and this court's 34-page opinion affirming that decision, one might think that Knight's case left the jury with an impossibly difficult task. Although the details of the underlying real-estate and monetary transactions are complicated, the primary issue the jury confronted was not nearly as perplexing. For the jury, this case hinged upon whether Knight allowed Brandon Barber to use Knight's IOLTA fraudulently to conceal funds in contemplation of Barber's bankruptcy. In my opinion, this issue is close, and a reasonable factfinder could have found either for Knight, or as it ultimately did, against him. Our legal system leaves the resolution of close issues like this one to a jury. "A district court judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result." *United States v. Rivera Rangel*, 396 F.3d 476, 486 (1st Cir. 2005) (internal quotation marks omitted) (quoting *United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir. 1986)). When "the award of 'a new trial is predicated on the district court's evaluation of the weight of the evidence . . . , it must be quite clear that the jury has reached a seriously erroneous result.'" *Id.* (alteration omitted) (quoting *Rothrock*, 806 F.2d at 322). Because I conclude that the district court overstepped its limited authority to afford such relief—an authority that must be "exercised sparingly and with caution," *United States v. Johnson*, 474 F.3d 1044, 1051 (8th Cir. 2007)—I respectfully dissent from the court's decision affirming the grant of a new trial.

To prove its fraud-related charges against Knight, the Government had to show (1) that Knight conspired with Barber to commit bankruptcy fraud, 18 U.S.C. §§ 371, 157, and (2) that Knight aided and abetted Barber in committing bankruptcy fraud by "knowingly and fraudulently" transferring or concealing assets "in contemplation of a case under title 11 [bankruptcy]," 18 U.S.C. §§ 152(7), 2. In affirming the district court's decision to grant Knight a new trial, this court faults the Government for

-35-

offering "little direct or circumstantial evidence that Knight's use of his IOLTA was motivated by an intent to defraud Barber's creditors in bankruptcy . . . ." *Ante* at 23. In my view, the evidence did not preponderate heavily against the jury's verdict. I therefore conclude that the district court abused its discretion when it found that a miscarriage of justice would have occurred if Knight did not receive a new trial.

As an initial matter, both the district court and this court rely on *In re Addison*, 540 F.3d 805 (8th Cir. 2008), to demonstrate the weakness of the Government's case. The district court noted that *Addison*, a civil bankruptcy case, stands for the proposition that simply placing money beyond the reach of creditors does not prove fraudulent intent. That may be true; however, the *Addison* decision limited its application to situations free from any other "indicia of fraud." *Id.* at 816. One example of such indicia, as explained in *Addison*, is "conduct intentionally designed to materially mislead or deceive creditors about the debtor's position . . . ." *Id.* (quoting *Matter of Armstrong*, 931 F.2d 1233, 1237 (8th Cir.1991)). In my view, the Government showed such conduct here. Indeed, even this court "agree[s] that the jury could have reasonably concluded that at least some of the money that passed through the IOLTA belonged to Barber and that Knight and Barber used the IOLTA *to impede creditors from learning about and pursuing these funds*." *Ante* at 21 (emphasis added).

Multiple emails presented at trial revealed Knight and Barber's scheme. In mid-2008, Knight emailed Barber, "I assume you are going to wire your portion and [James Van Doren's] to me so that it can *appear* to [F]irst [F]ederal and others that you aren't paying the money? Correct? I will put on my check [Van Doren's company] in the Memo line." In another email, Christy Bennett, a financial assistant in the Barber Group's accounting department, suggested that Knight write a check from his IOLTA to Barber so that Barber could pay off some debts. This tactic worried Barber, who stated that he "[h]ate[d] to run that much thr[ough] me but were

-36-

[sic] paying my [credit] card down . . . ." Knight, in turn, recommended paying some of the bills directly from his IOLTA and giving Bennett a check for a "lesser amount." In still another email, Knight contacted Barber and Van Doren about whether to use $100,000 to pay one of Barber's creditors. Knight explained to Barber that the money "would be coming out [of] the Escrow Account, but we will need to tell Enterprise that [Van Doren's company] will loan the money." Knight was unequivocal about why Van Doren's company needed to be involved: "We don't want Enterprise to know that there are funds available if they ask where the money is coming from."[17] All told, roughly $1.2 million passed through Knight's IOLTA between April 2008 and January 2009.[18]

Knight's actions with respect to NWARE further reveal the extent to which he plotted with Barber to conceal funds. Before Barber received money from a real-estate deal, Knight emailed him, "We might want to set up a new entity for you to take the payments . . . . We can set it up so that you don't own 100% (better creditor protection)." The next day, Knight formed NWARE. Van Doren testified that Barber once described NWARE as an entity that allowed him to conduct business without "creditors . . . know[ing] that he ha[d] money." Evidence at trial corroborated Barber's description. The Government presented an email in which Bennett asked Barber and Knight what address she should list on NWARE's paperwork. Barber worried that using the Barber Group's address might "put[] up a red flag." Knight interjected, "I wonder if [Bennett] could use her home address. I would rather it not have [the] same address as [the Barber Group]." As the court acknowledges, Knight

_____

[17]Although this payment was never made, this email nonetheless shows Knight's involvement in a scheme to conceal Barber's funds from creditors.

[18]The last of Barber's funds were emptied from Knight's IOLTA after a judgment creditor sent Barber interrogatories asking him to list all accounts in which he had made deposits.

made this suggestion "despite the fact that little-to-no NWARE-related activities occurred at Bennett's home." *Ante* at 9. Barber agreed, and Bennett listed her home as NWARE's registered address.

Because the Government presented enough evidence for a jury to conclude that Knight aided in concealing funds from Barber's creditors, conviction was proper if sufficient evidence also supported the conclusion that concealment occurred in contemplation of bankruptcy. And in my opinion, the evidence did not preponderate heavily against the jury's reasonable conclusion that Knight knowingly and intentionally allowed Barber to use Knight's attorney trust account to defeat the provisions of federal bankruptcy laws by concealing funds from potential bankruptcy creditors. The district court faulted the Government for failing to present direct evidence, noting that "[n]o witness testified to having personal knowledge of a conversation between Barber and Knight where a fraudulent scheme, an intention to defraud, or even a specific intent by Barber to file personal bankruptcy was discussed." This reasoning is unavailing, as "[p]ersons whose intention is to shield their assets from creditor attack . . . rarely announce their purpose." *United States v. Goodstein*, 883 F.2d 1362, 1370 (7th Cir. 1989). And even this court acknowledges that circumstantial evidence "did support an inference that Barber and Knight used the IOLTA to conceal Barber's (now exhausted) funds from his creditors *and the bankruptcy court*." *Ante* at 24 (emphasis added).

Though the district court and this court downplay the significance of the circumstantial evidence, I would not be so quick to dismiss its persuasiveness. Our court has long recognized that fraud and conspiracy often are proven by circumstantial evidence. *See Olson v. United States*, 133 F. 849, 854 (8th Cir. 1904) ("[I]t is rare[] that a conspiracy or fraud can be established by direct and positive evidence. It is usually shown by a series of acts and circumstances."). At trial, the Government presented evidence that Knight and Barber considered the possibility of

-38-

bankruptcy from the outset of their working relationship in early 2008. Before representing Barber, Knight had handled at least ten other bankruptcy matters. When Knight initially emailed Barber to offer his legal assistance, Knight portrayed himself as someone with "quite a bit of experience in the areas of concern." The next month, Knight proposed using the threat of filing for bankruptcy as a bargaining chip in negotiations with creditors. Knight also advised Barber to have his personal property appraised, which Knight explained "would typically be done before a bankruptcy filing." Knight told Barber, "We want the WHOLE WORLD to know when we have it appraised." These emails confirm testimony from a former Barber Group employee that bankruptcy was "on the table" in early 2008 when Barber "was beginning to realize that in some form or fashion, because of the pressure he was getting from certain creditors, that he was going to have to file to protect himself." Indeed, throughout 2008 and early 2009, Barber's bankruptcy became inevitable. Over this period, Barber's creditors obtained judgment after judgment—fourteen in total—against him, amounting to over $30 million. Knight, as counsel of record for Barber in most of these cases, was indisputably aware of Barber's deteriorating financial situation.

This evidence did not leave the jury to speculate about the connection between Knight's efforts to conceal Barber's funds and Barber's subsequent bankruptcy. After all, if not to conceal the transfer of assets from creditors in the eventual bankruptcy proceeding, why would Knight convert his IOLTA into Barber's personal, off-the-books bank account? Though the court suggests that Knight assisted Barber so he could stave off bankruptcy, the more natural explanation—and the one the jury found compelling—was that Knight used his IOLTA in a coordinated effort to defraud Barber's potential creditors in the impending bankruptcy proceeding. *See United States v. Maloney*, 466 F.3d 663, 667 (8th Cir. 2006) ("[T]he presence of one possible 'innocent' explanation for the government's evidence does not preclude a reasonable jury from rejecting the exculpatory hypothesis in favor of guilt beyond a

reasonable doubt."). Indeed, several facts undercut the court's suggestion that avoiding bankruptcy was Barber's primary concern. For example, Knight used the IOLTA to pay Barber's expenses for a trip to Las Vegas, including a $19,175 payment to the Venetian. Further weakening the court's theory, Knight and Barber failed to disclose that large sums of Barber's money had passed through Knight's trust account in the year preceding the bankruptcy filing. *Cf. United States v. Lake*, 571 F. App'x 303, 307 (5th Cir. 2014) (unpublished) (noting that the timing and amount of asset transfers, combined with erroneous declarations at the time of filing bankruptcy, evidenced intent to defraud under 18 U.S.C. § 152(7)).

The court's conclusion that the evidence of innocence weighs heavily against the jury's finding of guilt overlooks these facts, the context of Knight's hiring, his advice to Barber, and Barber's deteriorating financial situation. In addition, this determination overlooks Knight's inculpatory conduct during the subsequent bankruptcy adversary proceeding, which strongly suggests consciousness of guilt and fraudulent intent. Although Knight initially informed opposing counsel that he wanted to seek a continuance in the bankruptcy adversary proceeding, Knight declined to do so after opposing counsel threatened "to subpoena [Knight's] firm's bank records and depose [Knight] . . . . concerning the flow of money to and from [his] firm." And two days later, while Knight was preparing for the adversary proceeding, he emailed Barber about Van Doren's deposition testimony. Knight explained that Van Doren had testified that Barber gave Knight money "so judgment creditors could not get it (ie, intended to hinder delay or defraud creditor)." Knight characterized Van Doren's testimony as "sing[ing] like a canary." Barber responded, "I know, he screwed me."

In light of this evidence, I do not agree with the court's characterization of the Government's case as "highly circumstantial, tenuously connected, and 'largely invit[ing] only speculation and conjecture.'" *Ante* at 31. The facts of this case are

-40-

certainly complex, and the strength of the Government's evidence varied as to the extent and criminal nature of Knight's complicity in Barber's various attempts to evade his creditors. To sustain the jury's verdict, however, the district court did not need to find that the jury unraveled every factual and legal complexity involved in the underlying real-estate transactions involved in this case. Nor did the jury have to conclude that Knight aided Barber in *all* his unlawful actions. The question this case asked of the jury was far more straightforward: Did the evidence show that Knight allowed Barber to use the IOLTA intentionally to conceal the transfer of assets in contemplation of bankruptcy? The jury concluded that it did. And although the district court faults the jury for its relatively short deliberation, the court just as easily could have concluded that the jury's ability to render its verdict in just six hours confirms the straightforward nature of the issue it was charged with deciding. *See United States v. Brotherton*, 427 F.2d 1286, 1289 (8th Cir. 1970) ("[T]here is no rule of law which requires a jury to deliberate for any particular period of time . . . ."); *accord Segars v. Atl. Coast Line R. Co.*, 286 F.2d 767, 770 (4th Cir. 1961) (noting that the brief duration of deliberation suggested that the jury "so thoroughly understood the points at issue, and were so thoroughly in accord with respect to the verdict, that no more time was needed").

Our court has not hesitated to reverse the grant of a new trial when a district court "failed to give due weight" to persuasive evidence of guilt and assigned "unduly greater weight to" weak rationales of innocence. *United States v. Campos*, 306 F.3d 577, 580 (8th Cir. 2002). Although the district court conducted a thorough recitation of the evidence in its lengthy opinion, I nevertheless conclude that the court made just such a misstep here. In light of the evidence, I find no miscarriage of justice in the

jury's guilty verdict, and I conclude that the district court abused its discretion in granting Knight a new trial. For this reason, I respectfully dissent.[19]

_____

[19]I concur in the court's decision reversing the judgment of acquittal, but I disagree with the court's decision to affirm the new-trial grant on the false-statement count. Although the jury instruction did not identify the charged false statement, the indictment, which the jury took to deliberation, did. Moreover, the Government indicated in closing argument that it sought conviction on the false-statement count based upon the schedules submitted to the bankruptcy court. Under these circumstances, the district court should not have afforded Knight plain-error relief for the unobjected-to jury instruction because any error was not "clear or obvious" under settled law. *See Puckett v. United States*, 556 U.S. 129, 135 (2009); *see also United States v. Adams*, 604 F.3d 596, 600 (8th Cir. 2010) (finding that no variance occurred because "the government never wavered in its theory of the case"); *accord United States v. Renzi*, 769 F.3d 731, 744-45 (9th Cir. 2014) (finding no plain error in jury instructions that "fail[ed] to identify the specific 'thing of value'" charged where "the government's theory of conviction . . . remained consistent"); *United States v. Lemusu*, 135 F. App'x 52, 53 (9th Cir. 2005) (unpublished) (finding no variance or constructive amendment, in part, because "the jury's copy of the indictment included an accurate list of charged crimes").